In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 11-1266 & 11-1346

EGAN MARINE CORPORATION, et al.,

*Plaintiffs-Appellants/*
*Cross-Appellees,*

*v.*

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK,

*Defendant-Appellee/*
*Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 5295—**Matthew F. Kennelly**, *Judge.*

ARGUED NOVEMBER 1, 2011—DECIDED NOVEMBER 23, 2011

Before BAUER, FLAUM, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Egan Marine Corporation ("EMC")
and Service Welding and Shipbuilding, LLC ("SWS") are
embroiled in a contract dispute with their insurance
company, Great American Insurance Company of New
York ("GAIC"). The dispute centers on the terms and

scope of the plaintiffs' insurance policy, which indemnifies them against liability under several federal environmental protection laws or those laws' state-law equivalents. EMC and SWS attempted to invoke their policy for up to $10 million in coverage following an explosion on one of their vessels that resulted in an oil spill in the Chicago Sanitary and Ship Canal. They intended to apply that amount against any legal liability and costs they incurred as a result of the incident. GAIC contends that, under the terms of the policy, the spill rendered available only $5 million in coverage.

Additionally, the parties disagree about the amount GAIC owes EMC and SWS pursuant to a post-explosion agreement between them that EMC and SWS would provide cleanup and spill management services on their own behalf—a function contractually designated to GAIC. Under this arrangement, EMC and SWS agreed to charge GAIC at "cost," but each party disputes the other's understanding of and method of calculating "cost."

For the reasons discussed below, we affirm the judgment of the district court.

## I. Background

### A. Factual Background

EMC transports products on waterways. Its sister company, SWS, runs the shipyard where EMC maintains its vessels. Dennis Egan principally owns both EMC and SWS. EMC and SWS obtained insurance coverage from GAIC.

**1. The Insurance Policy**

The GAIC policy covered a number of EMC vessels against "incidents" during the policy's effective period. The policy defined "incident" as "[a]n event that exposes You to liability under [the Oil Pollution Act of 1990] or [the Comprehensive Environmental Response, Compensation, and Liability Act] or [the Federal Water Pollution Control Act] for which Section B [of this policy] provides coverage."[1]

In relevant part, Section B of the policy specified that GAIC would indemnify EMC and SWS against:

1. OPA90 (Federal)—Removal costs and expenses paid by You under Section 1002 of OPA90 (33 U.S.C. Section 2702), for which liability would have been imposed under the Laws of the United States if You had not voluntarily undertaken the removal of oil.

2. OPA90 (State)—Your liability under State law for those removal costs and expenses referred to in Section 1002 (22 U.S.C. Section 2702) of OPA90 but only to the extent that these could have been recovered under OPA90.

3. OPA90—Your costs and expenses You have paid either in avoiding or mitigating the liability

---

[1] Hereinafter, the Oil Pollution Act of 1990 is referenced as "OPA90." The Comprehensive Environmental Response, Compensation, and Liability Act is referenced as "CERCLA." The Federal Water Pollution Control Act, colloquially referred to as the "Clean Water Act," is referenced as "FWPCA."

in 1. OPA90 (Federal) or 2. OPA90 (State) as described above.

4. CERCLA—Costs and expenses You have paid where liability would have been imposed upon You if You had not acted voluntarily under 107(a)(1)(A) and (B) of CERCLA (42 U.S.C. Section 9607(a)(1)(A)) and with specific regard to "removal" "response" or "remedial action" as these terms are defined and applied under Section 101(23)-(25) of CERCLA (42 U.S.C. Section 9601(23)-(25)). This coverage includes claims for contributions [sic] under Section 1013(f)(1) of CERCLA (42 U.S.C. Section 9613(f)(1)).

5. Miscellaneous Spill Liability—Costs and expenses paid by You to mitigate liabilities for incidents where such occurrences are insured by this policy, but subject to our written expressed pre-approval.

6. Defense Costs—Costs and expenses paid by You to investigate and pursue a legal defense against claims or liabilities insured by this Policy. This coverage will terminate upon payment of judgements [sic] or settlements which exhaust the amount of insurance as stated in the Declarations Page of this policy.[2]

---

[2] Section A of the GAIC policy additionally defines defense costs as "[a]ll Legal expenses and other similar costs that are paid by You as a direct result of an incident insured by this policy."

7. Firefighting and Salvage—Firefighting, salvage, offloading, and disposal of Cargo, but only to the extent that such actions contribute to stopping a discharge or release, or prevent a substantial threat of a discharge or release under OPA90, CERCLA, or the FWPCA.

8. Limited Administrative Penalties—Your liability under the section of the [FWPCA] that was amended by OPA90 to allow for administrative penalties against You under Section (b)(6)(A)(l) of the FWPCA. The maximum amount of insurance payable by this Policy for this coverage is two hundred and fifty thousand dollars ($250,000) per incident, per Vessel, and shall be a separate limit from the amount of insurance shown elsewhere in the Policy. Penalties imposed under any other section of FWPCA, any other Federal Statute, or the laws of any State or subdivision thereof are specifically excluded. . . .

(emphasis in original removed). The policy covered each listed vessel for $5,000,000. It excluded from coverage "[a]ny liability imposed on You under any state law which liability is greater, broader, and/or more extensive than the liability that would be imposed under Section 1002 of OPA90 (33 U.S.C. Section 2702) or under CERCLA."

The policy also stated that, absent any controlling or applicable general maritime law, the laws of the State of New York governed the policy.

## 2. The Explosion, Its Aftermath, and Removal and Remediation Efforts

In January 2005, EMC was hired to transport several loads of clarified slurry oil from the Exxon/Mobil refinery in Joliet, Illinois to Ameropan Oil Company via the Chicago Sanitary and Ship Canal.

On January 19, 2005, the tank barge EMC 423, carrying the petroleum cargo, exploded in the Chicago Sanitary and Ship Canal. The barge lacked any means of self-propulsion, navigation, or crew, so, prior to the explosion, its movement was dictated by the tugboat Lisa E, which pushed it up the canal. Following the explosion, the EMC 423 discharged some of its petroleum cargo into the canal. Most of the cargo remained aboard the barge, which ultimately sank along the side of the canal. The EMC 423 and the Lisa E were insured under the GAIC policy.

The United States Coast Guard immediately requested Heritage Environment, a private company, remediate the spill site. Heritage set up a "containment boom" around the EMC 423. It also cleaned the Lisa E, which was covered in oil.

Simultaneously, EMC contacted GAIC. Pursuant to its agreement to provide EMC and SWS with spill management services as necessary, GAIC, through its emergency response consulting firm, Meredith Management Group, Inc., sent a representative, Captain Thomas Neumann, onsite. He arrived within 24 hours of the explosion on January 20, 2005. While present, Neumann undisputedly acted on behalf of GAIC.

On January 21, 2005, the Coast Guard sent EMC a letter designating the EMC 423 as the source of the discharge of oil into the canal. On January 26, 2005, the Coast Guard issued a "notice of federal interest," informing EMC that it could be held financially responsible for the spill, its removal costs, and damages. The notice instructed EMC to cooperate with the federal "on-scene coordinator," a Coast Guard officer, and to remove the discharged petroleum.

### a.   Agreement Between EMC and GAIC

Neumann agreed that EMC should conduct spill management for GAIC. EMC, thus, effectively contracted to provide its own spill management. EMC would raise the EMC 423 from the canal in order to salvage the ship, correct existing pollution, and avoid further contamination. Per Neumann's approval, EMC hired SWS to conduct the salvage operation. Neumann and EMC agreed that EMC and SWS would bill GAIC at cost because, as a contractor for GAIC, EMC could not make a profit from conducting spill management on behalf of its own insurer.

EMC and SWS proposed to reduce their standard rates by 20% to reflect cost and eliminate profit. SWS would bill only for employee time and not charge separate hourly or daily rates to use machinery and equipment. Dennis Egan agreed not to charge at all for his personal time as salvage master, which he testified would normally cost $1,500 per day.

GAIC agreed to pay 80% of EMC and SWS's invoices pending review and approval to ensure that the invoices reflected their true costs. Notably, however, neither party expressly communicated to the other its definition of "cost."

EMC and SWS proceeded with the salvage operation, and the EMC 423 was raised with much of the petroleum still in it. They ultimately transported it to the SWS ship-yard.

GAIC, again through Meredith Management, retained Global Risk Solutions to review and audit EMC and SWS's invoices.

At least as early as April 2005, Global Risk Solutions expressed concern that it could not verify that EMC and SWS were billing at cost. It communicated to EMC and SWS, via their respective Secretary-Treasurer and Controller, Robin Chanda, that the financial statements submitted did not support the hourly rates they were charging GAIC. Global Risk Solutions informed them that it intended to analyze their costs from scratch. Accordingly, it asked EMC and SWS to recalculate the basis for their charges, including the number of hours of equipment use, Egan's time, embedded expenses, and support for labor-related charges.

EMC and SWS did not provide the requested information to Global Risk Solutions. In part, they did not do so because they were concerned that any recalculation of the charges would not capture their true costs: due to the terms of billing, they had not been tracking those

details. Although Global Risk Solutions estimated that EMC and SWS's invoices might exceed their actual costs by at least several hundred thousand dollars, it never obtained sufficient information to establish EMC and SWS's cost rates.

### b. GAIC's Refusals to Pay

For many reasons, GAIC took issue with the indemnification amounts requested by EMC and SWS. GAIC concluded that the explosion implicated only the EMC 423 and its corresponding $5,000,000 of coverage. It based its conclusion on the Coast Guard's January 21, 2005 letter to EMC, in which it identified the EMC 423 as responsible for the oil spill, but did not similarly designate the Lisa E as responsible. In short, GAIC did not believe that it owed any indemnification for the Lisa E. At no time, however, did GAIC advise EMC as such or issue a reservation-of-rights letter in connection with EMC's request for coverage.

Moreover, on June 13, 2005, GAIC sent a letter to SWS, stating that it had exhausted its $5,000,000 policy limit. At this time, GAIC had not actually paid $5,000,000 to or on behalf of EMC and SWS. In justified its erroneous representation, in part, on Global Risk Solutions' cost analysis for the companies' spill management operations: if GAIC paid the amounts requested by EMC and SWS, then under advisement, the total amount paid and payable would exceed the $5,000,000 limit on coverage for the EMC 423. GAIC later acknowledged that more

coverage existed, and it made additional payments to EMC and SWS following its June 13 letter to the contrary.

As GAIC reviewed EMC and SWS's claimed costs, it recognized that it would need to independently calculate their final payment since they declined to provide the supporting financial details it requested. It determined, largely through estimation, that it owed EMC and SWS as much as $588,317 in reimbursement. It excluded from its calculation any cost incurred after June 7, 2005, the date that the Coast Guard informed the Illinois Environmental Protection Agency ("IEPA") that the recovery phase of cleanup was completed. *See* discussion *infra* at I.A.2.c.

GAIC ultimately paid EMC and SWS $727,000, augmenting the $588,317 owed to exhaust the $5,000,000 coverage limit on the EMC 423. It still refused payment of any kind for the Lisa E.

In February 2007, GAIC and EMC submitted a joint claim for reimbursement to the federal Oil Spill Liability Trust Fund. The claim requested reimbursement for the total amount GAIC paid in connection with the cleanup, including to EMC and SWS. It did not suggest that GAIC overpaid either company. The claim also requested reimbursement for any costs incurred by EMC and SWS, prior to June 7, 2005, that GAIC had not paid. It requested no reimbursement for any work completed after that date.

### c.  Government Involvement

On May 18, 2005, the Coast Guard's On-Scene Coordinator[3] sent EMC a letter entitled "termination of emergency response." The letter stated that the EMC 423 "no longer represent[ed] a substantial threat of discharge of oil or a hazardous substance." Accordingly, it continued,

> that portion of this emergency response relating to the barge EMC 423 and the cargo contained therein, . . . is complete, effective at the time the EMC 423 was successfully moored at [SWS]. . . . The only remaining emergency operations that remain under aegis of my [federal on-scene coordinator] authority are the operations related to the removal of oil related to this incident which remains on the bottom of the [canal] in the vicinity of the original explosion, fire and subsequent removal operations. You will be advised under separate cover how to proceed with these operations.

On that same day, the Coast Guard's Captain of the Port sent EMC a second letter, under its vessel policing authority, 33 U.S.C. § 1223, directing EMC to remove the remaining oil onboard the EMC 423. Ultimately, EMC delivered to its original customer the balance of the petroleum in the EMC 423's storage tanks. A significant amount of petroleum remained outside of the storage tanks, where it had been propelled by the explosion. Because GAIC stopped making payments to EMC and

---

[3]  Captain T.W. Carter served as both On-Scene Coordinator and Captain of the Port for the Coast Guard.

SWS, *see* discussion *supra* at I.A.2.b, the companies did not completely clean the petroleum outside of the tanks as requested by the IEPA. The EMC 423 remains in storage.

On June 7, 2005, the Coast Guard's On-Scene Coordinator sent a letter to the IEPA. He informed the agency that, although some petroleum remained on the bottom of the canal, further recovery efforts would undermine the IEPA's remediation goals. He, thus, declared completed the recovery efforts for the spill event. He then noted his understanding that the IEPA would be seeking complete site remediation from EMC.

### d.  Federal and State Liabilities

#### i.  State Agency Actions

EMC and SWS faced several accusations of liability as a result of the explosion, contamination, and cleanup efforts in this case. The IEPA, in September 2005, issued notice to EMC that it violated the law when it removed the petroleum residue from the EMC 423. Disposal of the residue, it alleged, threatened further contamination of the canal. In response, EMC retained counsel and an environmental consultant, as well as engaged in additional cleanup work. EMC allegedly incurred $10,215 in consulting fees, $18,400 in attorney's fees, $9,440 in disposal costs, and $72,320 in labor and machinery costs as a result of these efforts.

The IEPA also sued EMC in Illinois state court under the Illinois Environmental Protection Act, 415 ILCS 5/42(d)-(e). The agency claimed that 2,000 to 2,500 gallons of petroleum remained at the bottom of the canal as a

result of the explosion. It also contended that, during the salvage and transportation of the barge, an unnamed EMC tugboat discharged thirty gallons of diesel fuel into the canal, leaving an oil sheen on the canal's surface. It requested an injunction against further violations by EMC; civil penalties; all costs expended by the state in the suit, including expert witness, consultant, and attorney's fees; and any other equitable relief the court deemed appropriate. The IEPA's request for an injunction served as a vehicle by which it hoped to compel further cleaning by EMC.

EMC requested that GAIC represent it against the IEPA. GAIC agreed to represent EMC, understanding that the litigation could result in an order for additional cleaning at the spill site. GAIC claims that its representation was subject to the terms of EMC's insurance policy— in particular, the policy's limitations and exclusions regarding actions by state governmental agencies. When GAIC agreed to represent EMC, however, the letter it sent contained no reservation of rights and no specific reference to the policy's limitations and exclusions. It stated only that its defense would be subject to the insurance policy's terms and conditions.

GAIC, at an unspecified date and for unspecified reasons, stopped paying for EMC's defense. EMC continued to defend the suit with both its original attorney and in-house counsel. It incurred $32,154.75 in not-yet-reimbursed attorney's fees and expenses for the original counsel. It also expended $694.29 in not-yet-reimbursed litigation expenses. Although it originally claimed its costs for its own in-house counsel, EMC

withdrew this reimbursement request during the pro-
ceedings below.


### ii. Federal Actions

In June 2008, the federal government pursued in rem
claims against the Lisa E and the EMC 423, suing under
OPA90, the FWPCA, and the Rivers and Harbors Act.
*United States v. Egan Marine Corp.*, No. 08 C 3160, slip op. at
1-17 (N.D. Ill. Oct. 13, 2011). Under OPA90, it claimed
$1,500,000 in removal costs expended by the Oil Spill
Liability Trust Fund and in compensation paid to
GAIC and EMC. It also requested $25,000 in civil
penalties for each day of the spill cleanup.

The government's complaint names the Lisa E as the
EMC 423's only source of propulsion, and it identifies the
owners and operators of both vessels as the responsible
parties under OPA90.

This lawsuit, still ongoing, is not directly relevant to
this appeal. EMC, however, supports its claim that the
explosion implicated its $5,000,000 policy on the Lisa E
by relying, in part, on the federal government's conclu-
sion in its suit that the Lisa E was a party responsible
for the explosion and cleaning costs. GAIC continues to
dispute that it owes coverage under the Lisa E's policy.


## B.  Procedural Background

### 1.  Initial Proceedings

On September 15, 2005, EMC and SWS sued GAIC in
the United States District Court for the Northern District

of Illinois. They claimed that GAIC owed them at least $1.8 million for their recovery and remediation efforts and, additionally, wrongly refused to honor their policy on the Lisa E. These actions, they claimed, constituted (1) a breach of contract and (2) a breach of good faith and fair dealing.

EMC and SWS moved for summary judgment, requesting that the district court find that they were entitled to at least $10 million in coverage and that GAIC breached its contract and duty of good faith and fair dealing by not honoring its policy with respect to the Lisa E. GAIC also moved for summary judgment. It asked the court to find that the $5,000,000 paid to EMC and SWS discharged its obligations under the policy and that the companies were not entitled to any further disbursements.

On June 13, 3007, the district court granted GAIC's motion for summary judgment and denied EMC and SWS's motion.

On June 13, 2008, EMC appealed and requested relief from judgment under Federal Rule of Civil Procedure 60(b), claiming that the lawsuit filed against it by the federal government constituted new evidence with regard to the coverage implicated by the Lisa E, *see* discussion *supra* at I.A.2.d.ii. This Court granted EMC's motion to vacate and remanded the case back to the district court.

### 2.   Summary Judgment

GAIC filed counterclaims against EMC and SWS. It sought declaratory judgment that (1) it lacked any duty to defend EMC and SWS against the federal government's suit and (2) it exhausted its obligations under the policy and owed no disbursements to EMC and SWS for the Lisa E's involvement in the spill. It moved for judgment on the pleadings.

EMC and SWS cross-moved for summary judgment. They asked the district court to find that (1) they were entitled to $5,000,000 in coverage for the Lisa E's involvement in the spill; (2) GAIC was required to defend them against the federal government's suit; and (3) GAIC breached its duty of good faith and fair dealing by refusing to indemnify them with respect to the Lisa E.

The district court granted GAIC judgment on the pleadings with respect to the following: (1) it owed $5,000,000 per vessel, per incident and had fully honored the policy with respect to the EMC 423; (2) it owed no coverage for either the Lisa E or the EMC 423 for in rem liability. It denied any further judgment on the pleadings.

The district court then granted EMC and SWS's motion for summary judgment on their breach of contract claim, finding that GAIC owed $5,000,000 in coverage for the Lisa E, was obligated to pay defense costs up to that amount, and had breached its contract by not doing so. It denied summary judgment on their claim that GAIC breached its duty of good faith and fair dealing.

### 3. The Bench Trial and the District Court's Rulings

The district court held a bench trial to consider the following: (1) what damages, if any, GAIC owed based upon its refusal to apply the Lisa E's coverage; (2) whether GAIC breached the insurance policy by failing to pay all of the amounts that EMC and SWS claimed to have expended in responding to the explosion; and (3) whether GAIC breached its duty of good faith and fair dealing.

With respect to the first issue, the district court ruled that GAIC's refusal to make available coverage for the Lisa E did not result in any damages beyond unpaid defense costs. It found "no evidence that GAIC's decision that there was only $5 million in coverage . . . led it not to pay the plaintiffs' remaining invoices for the recovery work and to cut off reimbursement for costs incurred after June 7, 2005." GAIC was, however, liable for the unpaid defense costs. The court stated:

> [GAIC] was well aware that as of [June 7, 2005], the IEPA was still contending that further cleanup of the canal was required due to petroleum product that remained there following the explosion. [GAIC] also knew that the IEPA required further cleanup of petroleum residue that remained aboard the EMC 423. This, presumably, is why GAIC initially funded EMC's defense in the IEPA suit, which was filed at the end of August 2005. . . . Plaintiffs have proven beyond a preponderance of the evidence that GAIC breached the policy by cutting off its defense of EMC in the IEPA lawsuit. Plaintiffs

have also proven that they were damaged in the amount of $32,840.04 due to that particular breach.

The court also awarded $10,215 in unpaid consulting costs that EMC and SWS expended to defend against their alleged IEPA violation for disposing of the oil from the EMC 423, *see* discussion *supra* at I.A.2.d.i.

Regarding the second issue, the district court held that GAIC did not breach its contract by failing to pay the total sum claimed by EMC and SWS as costs. It concluded:

> [t]he fact that charges for equipment use, Egan's time, etc. were incorporated into the rates unquestionably indicated that the companies were not trying to gouge GAIC. But a conclusion that plaintiffs proved by a preponderance of the evidence that the unpaid charges represented their costs and not a profit would require too many inferential leaps. Indeed, plaintiffs made no real attempt to prove in the lawsuit that the charged rates represented their costs. Rather, they relied on what they contended was an agreement by Neumann on GAIC's behalf to pay the invoiced rates. As the Court has found, however, plaintiffs failed to prove by credible evidence that there was such an agreement. Indeed, their claim of an agreement was directly refuted . . . by contemporaneous and near-contemporaneous documentary evidence that made it clear that EMC and SWS's claimed costs—not just employee hours–were subject to audit and verification. . . . That is not to say that GAIC . . . properly handled the matter of billing during the salvage and recovery phase of the

> project. . . . The Court is unpersuaded, however, that EMC and SWS were harmed by this in any way that they could not overcome. They were given, and had, ample opportunity (both in 2005 and this action) to try and show that they had, in fact, billed at cost. But they were unable or unwilling to prove this, either to . . . GAIC in 2005 or to this Court at trial.

The district court concluded, however, that GAIC did breach its contract by refusing to indemnify EMC and SWS for any costs after June 7, 2005. GAIC's contention that it owed nothing on the policy after the Coast Guard declared recovery work completed on June 7, the district court ruled, "[wa]s far too simplistic." The court stated:

> [P]laintiffs have proved by a preponderance of the evidence that even after May 18, 2005 and June 7, 2005, [they] were still exposed to liability under OPA90 or the Illinois equivalent based on the material that remained on board the EMC 423. The [IEPA complaint filed in state court at the end of August 2005], however, is sufficient to support an inference that plaintiffs were no longer exposed to OPA90 or state-equivalent liability a[t] the end of August 2005. Plaintiffs, who bore the burden of proof, failed to prove otherwise. For these reasons . . . [t]he Court concludes . . . that plaintiffs have shown by a preponderance of the evidence that storage and cleanup costs they incurred after June 7, 2005 (GAIC's apparent cutoff date) and before August 31, 2005 are covered by, at a minimum, paragraphs 3 and 7 of the coverage section of the GAIC policy.

The court ruled that EMC and SWS could recover the same 80% of their invoices between June 7 and August 31, 2005 that GAIC paid on their pre-June 7 invoices. As such, GAIC owed EMC and SWS $335,356 on its post-June 7 invoices.

Finally, the court considered EMC and SWS's claim that GAIC breached its duty of good faith and fair dealing, holding that they could not prevail against GAIC. First, the court found no basis in admiralty law to support an independent tort claim for breach of a duty of good faith and fair dealing in connection with a maritime insurance policy. Applying New York law, it concluded that EMC and SWS could not bring an independent claim for breach of good faith and fair dealing if it was based only on the conduct that formed the basis for a breach of contract claim as well. The court concluded that EMC and SWS alleged no "conduct separate from GAIC's contractual breaches that would give rise to a tort claim." Accordingly, it ruled in favor of GAIC.

In total, the court ordered GAIC to pay EMC and SWS $378,624, the aggregate of the $10,215 in consulting fees, the $32,840 spent defending against the IEPA lawsuit, and the $335,356 in invoiced costs.

Both parties presently and timely appeal.

## II. Discussion

We review a grant of summary judgment de novo. *See Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 359 (7th Cir. 2011). Summary judgment is appropriate

when no issue of material fact exists to be tried, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010). As it examines the record, the Court considers all facts and draws all inferences in the light most favorable to the non-moving party. *See Egan v. Freedom Bank*, No. 10-1214, 2011 WL 4600471, at *1 (7th Cir. Oct. 6, 2011).

In an appeal from a bench trial, "we review a district court's conclusions of law de novo, and we review its findings of fact, as well as applications of law to those findings of fact, for clear error." *Trustees of Chicago Painters and Decorators Funds v. Royal Int'l Drywall and Decorating, Inc.*, 493 F.3d 782, 785 (7th Cir. 2007) (quoting *Keach v. United States Trust Co.*, 419 F.3d 626, 634 (7th Cir. 2005)).

## A.  EMC and SWS Claims on Appeal

EMC and SWS challenge the district court's damages award for their breach of contract claim. They argue that the district court should have ordered their full reimbursement for their claimed costs, not merely for 80% as paid by GAIC. They also contend that the district court improperly truncated their right to collect on their policy on August 31, 2005.

EMC and SWS further maintain that the district court erred in ruling against them on their claim for breach of good faith and fair dealing. They assert they successfully raised and proved their claim under New York law.

**1. The District Court's Determination that EMC and SWS Were Not Entitled to Full Payment of Their Claimed Costs Was Not Clear Error**

EMC and SWS claim that GAIC agreed to pay them 80% of their standard rates and that the reduced rate would constitute charging at cost. GAIC counters that they agreed to the 20% reduction *subject to review and approval*. Accordingly, they did not have to pay any invoice that did not substantiate that the 20% reduction reflected EMC and SWS's true costs sans profit.

The district court considered the evidence presented by the plaintiffs, namely testimony by Dennis Egan and Robin Chanda, but it found their testimony "unpersuasive." It held that EMC and SWS proved neither that GAIC agreed to treat the 20% reduction as cost nor that their charged rates were, in fact, their costs. *See* discussion *supra* at I.B.3.

Indeed, both GAIC in 2005 and the court invited EMC and SWS to reconstruct their costs as best they could and provide numerical justification for their invoices. They refused both invitations, asserting that their agreement with GAIC precluded them from tracking the necessary billing details during the cleanup operations and that there was no feasible way to meaningfully capture those specifics ex post. The district court recognized the difficulty posed by EMC and SWS's task, but found "no indication that evidence that would have permitted [them] to prove their costs was unavailable to them." As the court elaborated:

> [P]laintiffs could have provided estimates of their unrecorded time for equipment usage and the work of Egan as salvage master . . . . Alternatively, plaintiffs could have offered in this litigation (just as they could have done in 2005) an accounting analysis or other evidence to show that they had charged at rates that amounted to their costs relating to the salvage and recovery project. Or they could have tried to document Egan and Chanda's claim that they were charging at rates that actually were the same rates that resulted in zero profit or a loss in 2004. . . . But [they] did not take any of these routes. Rather, they chose to rely on a theory that [GAIC] agreed up-front to the particular rates [they] quoted and on the proposition that GAIC admitted the accuracy of those rates after the fact. That theory and proposition were insufficiently supported . . . .

Based on the evidence submitted by EMC and SWS, we conclude that the district court's analysis contains no clear error. EMC and SWS did not provide sufficient support either that GAIC agreed to the 20% rate reduction whole-cloth or that the amounts they claimed reflected their true costs. They are not entitled to any additional payments under this theory.

### 2. EMC and SWS Were Not Entitled to Payments after August 31, 2005

EMC and SWS contend that the EMC 423 was not completely cleaned on August 31, 2005 and, accordingly,

GAIC was required to continue indemnification under the policy. GAIC cross-appeals that its indemnification responsibilities ended on June 7, 2005, after the Coast Guard deemed oil recovery efforts terminated.

The district court reasoned that, under the terms of the policy, GAIC owed EMC and SWS coverage on salvage operations, offloading, and disposal of cargo "to the extent that such actions contribute[d] to stopping a discharge or release, or prevent[ed] a substantial threat of a discharge or release under OPA90, CERCLA, or the FWPCA." *See* discussion *supra* at I.A.1. The policy also demanded coverage for expenses to mitigate liability under OPA90 and CERCLA. *Id*.

The district court found that coverage ended on August 31, 2005 because, in its September 2005 lawsuit against EMC and SWS, the IEPA "referenced only the actual spills and not any ongoing threat of further contamination." This, it concluded, "support[ed] an inference that the plaintiffs were no longer exposed to OPA90 or state-equivalent liability a[t] the end of August 2005[,] [and] [p]laintiffs, who bore the burden of proof, . . . failed to prove otherwise." *See* discussion *supra* at I.B.3.

On the evidence before us, we find no error in the district court's ruling. EMC and SWS, enjoyed and continue to enjoy the burden of proof on this issue, and nothing they have provided the district court or this Court convinces us that they were entitled to further payments after August 31, 2005. The district court did not err by tailoring its damage award.

### 3. The District Court Did Not Err By Denying EMC and SWS's Breach of Good Faith and Fair Dealing Claim

The district court rejected EMC and SWS's claim that the GAIC breached its duty of good faith and fair dealing because admiralty law did not support such a claim and New York law, to the extent that it did, precluded claims where the conduct underlying the breach of good faith and fair dealing claim was the same conduct generating a breach of contract claim.

In reaching this conclusion, the district court relied on *Cary Oil Co. v. MG Refining and Marketing, Inc.*, 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000) ("Under New York law, a claim for breach of the implied covenant will be dismissed as duplicative if the conduct allegedly violating the implied covenant is also the predicate for breach of the underlying contract.").

EMC and SWS find *Cary* inapposite. They argue, first, that *Cary* is not an insurance case and, thus, not controlling. Second, they assert that *Cary* fails to govern after 2008, when the New York Supreme Court, Appellate Division, in *Panasia Estates, Inc. v. Hudson Ins. Co.*, clarified that a plaintiff could recover "consequential damages resulting from a breach of the covenant of good faith and fair dealing . . . in an insurance contract context, so long as the damages were within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." 10 N.Y.3d 200, 203 (N.Y. App. Div. 2008) (quoting *Bi-Economy Mkt., Inc. v.*

*Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 192 (N.Y. App. Div 2008)) (internal quotation marks omitted).

GAIC rightly points out, however, that New York courts—subsequent to *Panasia* and *Bi-Economy*—view claims for breach of good faith and fair dealing as "duplicative of a claim sounding in breach of contract." *See, e.g., Goldmark, Inc. v. Catlin Syndicate Ltd.*, No. 09-CV-3876, 2011 WL 743568, at *4 (E.D.N.Y. Feb. 11, 2011). A breach of the duty of good faith may justify the recovery of consequential damages in addition to the loss insured by the policy at issue, but that breach is another means of recovery under the contract and not a separate cause of action in and of itself. *Id.* To this end, EMC and SWS may not recover on an independent breach of good faith claim.

EMC and SWS also do not recover consequential damages for bad faith under their breach of contract claim. The district court held that GAIC's breaches "were made in good faith and without malice." EMC objects to this characterization, arguing that GAIC's misrepresentations that the policy was exhausted when it was not constitutes bad faith dealings that merit damages: GAIC "consistently refused to communicate with the insured, never once reserved its rights, has repeatedly ignored its duty to independently evaluate the coverage under the policy (including for cargo removal), and has misrepresented the coverage under the policy . . . , including the claim that the policy was exhausted."

With these facts before it, the district court did not find bad faith, and the plaintiffs present no new evidence

to suggest that its decision was clearly erroneous. *Cf. Am. Nat'l Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 270 (2d Cir. 1995) ("The district court did not find bad faith and we discern no facts here that would justify reversing that finding. . . . [I]t is not bad faith for an insurer to fight liability when policy coverage is unclear.").

## B.  GAIC's Cross-Appeals

GAIC challenges that (1) the district court improperly granted summary judgment in favor of the plaintiffs that it owed coverage on the Lisa E; (2) it owes no coverage for any cleanup costs following June 7, 2005; (3) it owes no coverage for any IEPA suits regarding remnant oil on the EMC 423; and (4) it owes no defense costs with respect to the IEPA's suit against EMC and SWS for injunctive relief.

### 1.  The Lisa E's Coverage Applied

GAIC contends that the explosion did not implicate the policy on the Lisa E and the district court mistakenly granted summary judgment in favor of the plaintiffs. OPA90, it argues, only holds liable the vessel that spilled the oil—the EMC 423. OPA90 states:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters

or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a). OPA90 defines "responsible party" as, "in the case of a vessel, any person owning, operating, or demise chartering the vessel." 33 U.S.C. § 2701(32)(A). It defines vessel as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water, other than a public vessel." 33 U.S.C. § 2701(37).[4] Because the Lisa E did not, itself, discharge any oil into the canal, GAIC maintains that the vessel is beyond the scope of coverage.

Assuming arguendo that, despite the EMC 423's dependence upon the Lisa E for propulsion and navigation, the two vessels may not be considered a single vessel for purposes of OPA90, GAIC ignores that OPA90 holds liable not only those vessels that discharge oil, but also that "pose[] the substantial threat of a discharge of oil" as well. 33 U.S.C. § 2702(a).

The Lisa E satisfies OPA90's definition of "vessel." Furthermore, while the tug did not itself house the petro-

---

[4] GAIC is correct that OPA90 separately defines "tank vessel" as "a vessel that is constructed or adapted to carry, or that carries, oil or hazardous material in bulk as cargo or cargo residue . . . ." 33 U.S.C. § 2701(37). However, it does not clearly articulate why this distinction is relevant for purposes of understanding liability under OPA90, which does not distinguish between a vessel and a tank vessel with respect to its elements of liability. *See* U.S.C. 33 § 2702(a).

leum cargo within its hull, it was attached to the EMC 423, which did. Specifically, the Lisa E was the sole means of propulsion and navigation for the EMC 423. By virtue of its propelling the EMC 423 and its petroleum cargo through Illinois' waterways, the Lisa E posed a substantial threat of a discharge of oil and is, therefore, subject to liability under OPA90.[5]

Interpreting the statute as GAIC suggests and treating the Lisa E and EMC 423 as entirely separate entities for purposes of coverage yields a curious result. For purposes of OPA90, a vessel is a watercraft "used, or capable of being used, as a means of transportation on water." 33 U.S.C. § 2701(37). Without the Lisa E, or another means of propulsion, the EMC 423 would not satisfy this definition: it would not be used or would be capable of being used as a means of transportation on water because it could not power itself or steer. The EMC 423 and its petroleum cargo would be exempt from liability under OPA90.[6] This perverse result thwarts OPA90's intent and suggests that the Lisa E, to the extent it subjects the EMC 423 to coverage and, by propelling the barge,

---

[5] We note that OPA90 offers no further definition or elaboration for the term "substantial threat."

[6] One could argue that EMC 423 could satisfy OPA90's definition of "facility," which is "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil," 33 U.S.C. § 2701(9), but this is a definitional stretch not worth pursuing.

threatens a discharge of oil, must be subject to liability under the statute.

The district court appropriately granted summary judgment in favor of EMC and SWS on this point, and the explosion implicated the Lisa E's $5,000,000 policy such that those funds are available to the plaintiffs.

### 2.   GAIC Must Indemnifty EMC and SWS for Their Cleanup Costs Between June 7, 2005 and August 31, 2005

GAIC argues, first, that it owes no coverage after June 7, 2005 because, on that date, the Coast Guard announced recovery operations for the spill concluded. Second, it asserts that if it does owe coverage, the district court erred in awarding $355,569 in damages because it also held that EMC and SWS could not substantiate its costs, including those after June 7, 2005.

As an initial matter, the district court did not clearly err when it found that GAIC owed coverage after June 7, 2005. *See* discussion *supra* at I.B.3. On appeal, GAIC reiterates its argument that the Coast Guard's On-Scene Co-ordinator declared the spill over on June 7, 2005. It disputes the district court's finding that EMC and SWS faced requests from the IEPA to continue its cleaning operations both in the canal and with respect to the EMC 423 after June 7 as based on heresay; however, it offers no new arguments or evidence to undermine the district court's analysis. GAIC, in short, simply disagrees with the outcome.

As the district court acknowledged, determining GAIC's exposure for EMC and SWS's post-June 7 invoices is "difficult." The parties never established and presently disagree about what amounts appropriately constitute EMC and SWS's true costs. EMC and SWS claim they are owed the full amount they invoiced—$723,710—and GAIC asserts that it owes nothing.

Confronted with circumstances like these, where the terms of an oral contract are ambiguous, New York law considers "the acts of the parties thereunder [as] of controlling importance in its true interpretation." *Johnsten v. Dahlgren*, 62 N.Y.S. 1115, 1119 (N.Y. App. Div. 1900). In this case, the district court calculated that GAIC willingly paid 80% of EMC and SWS's claimed costs prior to June 7, 2005, at which time it was already aware of the substantiation problems presented by their method of invoicing. It was not clear error, therefore, to infer that GAIC would and should pay 80% of the post-June 7 invoices, particularly since GAIC offered the district court no alternative calculation of what it owed for the post-June 7 invoices. We affirm the district court's awarding EMC and SWS $355,569 in damages.

### 3. GAIC is Liable for the Consulting Costs Expended to Defend Against the IEPA's Charges Regarding the Disposal of the Remnant Oil on the EMC 423

The district court awarded EMC and SWS $10,215 for consulting costs it incurred addressing the IEPA's claim that its removal of the petroleum residue from the EMC

423 violated the law. *See* discussion *supra* at I.A.2.d.i; I.B.3. GAIC argues that there is "no proof to suggest the removal of cargo from [EMC 423] after May 18[, 2005] as the result of the [Captain of the Port] Order to remove the cargo from the uncertified Barge had anything to do with avoiding an OPA90 or similar Illinois state statute. Nor does it involve a CERCLA exposure."

Based on the evidence before us, we hold that the district court did not commit clear error when it awarded EMC and SWS $10,215 in consulting costs to defend against these charges. The court reasonably concluded that the fees were covered by the policy, and we find no compelling reason to disturb its ruling.

### 4. GAIC is Liable for Legal Costs Incurred Defending Against the IEPA's Claim for Injunctive Relief

GAIC challenges that it is not responsible for any of EMC and SWS's defense costs with respect to the IEPA suit, including the $32,840 awarded by the district court. *See* discussion *supra* at I.B.3. The district court reasonably determined that EMC and SWS incurred these costs as they confronted potential liability under OPA90 and its state-law equivalents. The costs are, therefore, covered by the policy such that GAIC owes indemnification. Based on the evidence before us, we conclude that the district court did not clearly err in so finding, and we decline the invitation to overturn its damage award.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.