In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-1214

BELINDA EGAN,

*Plaintiff-Appellant,*

*v.*

FREEDOM BANK, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 3:09 CV 50013—**Philip G. Reinhard,** *Judge.*

ARGUED MAY 28, 2010—DECIDED OCTOBER 6, 2011

Before MANION, WILLIAMS, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Only seven months after Freedom Bank recruited Belinda Egan to serve as one of its vice presidents, the bank fired her. She had no performance issues, no attendance problems, and no complaints against her. What she did have, though, was dinner shortly after she began with a member of the bank's board of directors. The board member told her the fantasies he had about her, and she declined his advances. Egan complained to the

bank's Human Resources officer that the board member had sexually harassed her, and the board member re-signed. Shortly after that, the person named as the bank's new president told its then-president that he heard Egan had done something that she should have been fired for. And about two months after the new president assumed office, Egan was fired. A jury might credit the bank's stance that the new president eliminated Egan's position simply to reduce inefficiencies. Or it might agree with Egan that the bank terminated her in retaliation for her claim of sexual harassment. We conclude that the conflicting inferences that can be drawn from the record require a resolution by a jury. Therefore, we reverse the entry of summary judgment against Egan on her retaliation claim.

## I. BACKGROUND

As this appeal comes to us from the entry of summary judgment against her, we recount the narrative that follows by viewing all facts in the record and drawing all reason-able inferences in the light most favorable to Egan. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). Greg Dempsey, then the president of Freedom Bank, contacted Belinda Egan in the spring of 2007 about a position at the bank. He already knew Egan, as the two had worked together at a different bank. Egan accepted Freedom Bank's offer to become its vice president of retail banking and began working there on July 17, 2007.

Egan met Don Burton, a member of the bank's board of directors, during her first week on the job. Burton came into the bank when he was onsite for a board meeting,

and Egan asked his opinion about challenges Freedom faced in a particular market. They agreed to continue their conversation a week later over the lunch hour at Applebee's. After that meeting, Egan saw Burton several times over the ensuing months when he would occasionally stop in the bank. They agreed to meet again on September 13, 2007, and Burton asked her, "Do you want to meet at my place or somewhere else?" Egan named a restaurant. They met there at about 4:00 p.m., and Burton gave Egan feedback on a document she had requested that he review.

Egan saw Burton again when she attended a bank board meeting on September 18, 2007. Burton called her that week and said he wanted to meet with her to discuss her meeting with Larry Henson, the CEO of Freedom Bank's parent corporation, and they agreed to meet at a restaurant in the mid afternoon of September 20, 2007. That day, Burton and Egan discussed her meeting with Henson, and Burton told Egan that he had recommended to the board that they consider her to be the next president of Freedom Bank. Burton also said that the board of directors had the power to fire the bank's senior management team, which caused Egan to feel uncomfortable. The conversation did not only involve work matters, however. Burton told Egan that he fantasized about making love to her on a dance floor and wanted to take her to Las Vegas and other places around the world. Egan declined his advances, and Burton replied, "If you change your mind, I'll be home alone next Tuesday." Wanting to leave, Egan secretly told her husband to telephone her, and, when the call came, she answered and informed Burton she needed to leave.

Egan told her friend Sheila Dempsey what had tran-
spired and asked her not to tell her husband Greg Demp-
sey, the president of Freedom Bank at the time. The next
day, Sheila apologized and told Egan that she
had informed her husband what had happened. Egan
and Greg Dempsey then discussed her conversation
with Burton. On September 24, 2007, Egan complained
to the bank's vice president of Human Resources,
Rick Mineck, about what Burton had said to her at dinner.
Mineck opened an investigation into Egan's complaint.
Before Mineck could interview Burton, Burton resigned
from the bank's board of directors. Mineck sent Egan
a letter on October 2, 2007 stating that he had investigated
Egan's complaint and that action had been taken to
prevent a reoccurrence of a similar incident. The letter
also stated that no adverse action or retaliation would
occur as a result of the complaint and that if she believed
she was the subject of adverse action or retaliation,
she should immediately contact Larry Henson, the CEO
of Freedom Bank's parent corporation.

Greg Dempsey was transitioning out of his role as
bank president around this time. Dave Barajas, Jr.
was ultimately hired to replace him. Henson told Egan
that she had been a candidate for the president position
but that another person had been chosen, and he said
that if she was willing to commit the time, he was
willing to fund her courses in a graduate school banking
program.

Barajas and Greg Dempsey had various conversations as
Barajas was considered for and prepared to become bank

president. In a conversation critical to this case, according to Dempsey, during September or early October of 2007, Barajas told him that he had heard Egan "had done something that she should have been fired for." Dempsey believed Barajas was referring to Egan's report that Burton said inappropriate things to her over dinner. Barajas denies making the statement to Dempsey.

Barajas officially began as president of Freedom Bank in early December of 2007. Egan's responsibilities initially increased because Barajas relied on her for day-to-day operations as he learned the job, but she said he refused to meet with her about plans for the future. Barajas did meet with others regarding the future, though, and he hired four new employees over the next several months. He hired Richard McCormick in January of 2008 as vice president of private banking, Pam Topper to serve as vice president of corporate services, Amy Young to assist McCormick and then later to handle daily branch management duties, and Lyle Spaulding as a commercial lender.

On February 22, 2008, Barajas wrote a letter to Egan advising her that he had decided to eliminate the position of vice president of retail banking, Egan's position. The letter gave no reason for this decision. Egan filed suit alleging retaliation, a hostile work environment, and discrimination on the basis of her sex. The district court entered summary judgment against Egan, and she appeals.

## II. ANALYSIS

### A. Summary Judgment Rulings

We review the district court's grant of summary judgment de novo, and we view all facts and draw all reasonable inferences therefrom in the light most favorable to Egan, the nonmoving party. *See Poer v. Astrue*, 606 F.3d 433, 438-39 (7th Cir. 2010). Summary judgment is only appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Title VII makes it unlawful for an employer to discriminate against an employee for opposing a practice that Title VII forbids. 42 U.S.C. § 2000e-3; *Poer*, 606 F.3d at 439. A plaintiff may proceed under either the direct or indirect method to prove her claim of retaliation in violation of Title VII. *Poer*, 606 F.3d at 439. To proceed under the direct method as Egan does here, a plaintiff must show through either direct or circumstantial evidence that (1) she engaged in statutorily protected activity; (2) she suffered an adverse action taken by the employer; and (3) there was a causal connection between the two. *Id.* at 439. If the plaintiff's evidence of retaliatory animus is contradicted,

> [T]he case must be tried unless the defendant presents unrebutted evidence that it would have taken the adverse employment action against the plaintiff anyway, "in which event the defendant's

> retaliatory motive, even if unchallenged, was not
> a but-for cause of the plaintiff's harm."

*Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)).

The parties agree that Egan's complaint to her Human Resources department that Burton had sexually harassed her constitutes statutorily protected activity. *See* 42 U.S.C. § 2000e-3(a). It is also clear that termination constitutes an adverse action. *Haywood*, 323 F.3d at 531. The issue, then, is whether Egan has introduced sufficient evidence from which a jury could find that there is a causal connection between her protected activity and her firing. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

Freedom Bank maintains that Barajas and the bank simply made a business decision to eliminate Egan's position, and that her firing was not motivated in any way by her harassment complaint. Barajas testified in his deposition that Egan's tasks were duplicative of those performed by another employee, and that for that reason, a business decision was made to eliminate Egan's position. Consistent with Barajas's position, Henson testified that he and Barajas participated in discussions evaluating the bank's entire organizational structure. Henson stated that the bank was losing

money, so its leaders were attempting to make business decisions as to how best to proceed to develop the bank with a structure that ensured its profitability going forward. As part of that review, Henson said the decision was made to eliminate the middle manage-ment position Egan occupied at the time. Henson also stated that at least one other position had been eliminated since the decision was made to eliminate Egan's position.

With respect to the new hires, Henson testified that he had specific discussions with Barajas before Barajas was hired regarding new people that he might want to hire and what their roles might be. In particular, Henson said they discussed McCormick, whom Freedom Bank had been trying to recruit for a year or two. They also discussed Pam Topper, who like McCormick worked at a different bank where Barajas had served as a director, and they discussed a third person as well. The bank therefore takes the position that these new hires were not inconsistent with its decision to terminate Egan's employment.

The bank's explanation is plausible, but on summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Although a jury might agree with the bank that it eliminated Egan's position for efficiency and operational reasons, there is also sufficient evidence in the record, viewed in the light most favorable to Egan

as we must, from which a reasonable jury could conclude that the bank instead fired Egan because she complained she had been sexually harassed by one of the bank's esteemed board members. Notably, Greg Dempsey asserts that Barajas told him he heard Egan "had done something she should have been fired for." Although the bank argues that the reference in the statement is ambiguous, certainly one reasonable conclusion that can be drawn from the comment is that Barajas was referencing Egan's complaint that Burton had sexually harassed her. Indeed, that was the conclusion Dempsey drew. That conclusion need not even be the only reasonable conclusion that could be drawn to survive summary judgment; even so, there is no other explanation suggested by the record for what Barajas could be referencing.

There are other factors a jury could weigh in Egan's favor as well. A jury might also consider that Egan's position was the only one the bank eliminated in 2008. It could also look to the fact that although the bank maintained that financial considerations were one reason for the decision to eliminate Egan's position, it nonetheless hired four other persons in the first few months of Barajas's tenure. And Egan had no performance issues. In short, Egan's claim that the bank retaliated against her and eliminated her position because she complained of sexual harassment are "not so incredible or implausible . . . that a reasonable jury could not find in [her] favor." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010). We therefore reverse the grant of summary judgment on Egan's retaliation claim.

Egan also makes perfunctory arguments in her brief that her hostile work environment and gender discrimination claims should proceed to trial. The single verbal proposition in this case by a member of the board of directors does not rise to the level of a hostile work environment, however. *See Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691-92 (7th Cir. 2010) (comments must be severe or pervasive to create a hostile work environment). The bank's hire of a male as its president instead of Egan does not create a triable issue that it discriminated against her on the basis of her gender, as she does not develop any argument as to why she was similarly qualified. *See Bodenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009) (issues not developed in an opening brief are waived). Summary judgment on the hostile work environment and gender discrimination claims was proper.

B. Magistrate Judge's Orders

Egan also wishes to challenge orders entered by a magistrate judge on November 6, 2009 and January 5, 2010. The latter order directed Egan to pay the defendants $4,815. The order also stated it would set a time by which the amount must be paid after the district court decided the defendants' pending motion for summary judgment. Both parties characterize the orders as sanctions orders.

The district court granted the defendants' motion for summary judgment on January 11, 2010 and entered judgment that day. The district court made no mention

of the magistrate orders, nor had Egan objected to them. She maintains she did not object because the district court's judgment was entered before the fourteen-day time period to object to the magistrate's latest order had run. *See* Fed. R. Civ. P. 72. To date, no time has been set by which the attorneys' fees must be paid, nor has the district court considered the propriety of the award.

The defendants maintain we lack jurisdiction to consider the magistrate's orders, and they are correct. We first note that our jurisdiction over the substantive appeal was clear. *See Budinich v. Becton Dickinson and Co.*, 486 U.S. 196, 200-01 (1988); *Houben v. Telular Corp.*, 231 F.3d 1066, 1071 (7th Cir. 2000). With respect to the magistrate orders, there is an initial question as to whether there is even a final order, as the last order did not set a time by which the fees were to be paid and instead stated that a time would be set at a later date. *See Shapo v. Engle*, 463 F.3d 641, 643 (7th Cir. 2006) (describing test for finality as whether the judge has finished with the case). More importantly here, the parties had not consented to proceed before a magistrate judge under 28 U.S.C. § 636(c). In the absence of a consent, a magistrate judge may only recommend a sanctions disposition to the district court, and only the district court's decisions are reviewable in the appellate court. *See Directv, Inc. v. Barczewski*, 604 F.3d 1004, 1011 (7th Cir. 2010); *Alpern v. Lieb*, 38 F.3d 933, 936 (7th Cir. 1994); *see also King v. Ionization Intern., Inc.*, 825 F.2d 1180, 1185 (7th Cir. 1987) ("The only part of the statute that expressly authorizes the magistrate to enter a final judgment appealable

directly to the court of appeals is 28 U.S.C. § 636(c).”). We therefore lack jurisdiction over the challenges Egan would like to make to the magistrate's orders. On remand, the district court will have the opportunity to consider the orders, *see Alpern*, 38 F.3d at 936, along with the defendants' arguments that Egan failed to object to the orders in a timely manner.

### III.  CONCLUSION

The judgment of the district court is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.