In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2891

IP OF A WEST 86TH STREET 1, LLC, et al.,

*Plaintiffs-Appellants,*

*v.*

MORGAN STANLEY MORTGAGE
CAPITAL HOLDINGS, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-CV-00573—**Sarah Evans Barker**, *Judge*.

ARGUED APRIL 9, 2012—DECIDED JUNE 11, 2012

Before FLAUM and HAMILTON, *Circuit Judges*, and
FEINERMAN, *District Judge*.[*]

FLAUM, *Circuit Judge*. In this case, twenty limited liability
companies ("the Investors") joined together to invest in

---

[*] The Honorable Gary S. Feinerman, United States District
Court for the Northern District of Illinois, sitting by designation.

property in Indiana. Needing a loan to finance their purchase, they formed a distinct limited liability company, IP of A Fund Manager, LLC ("IPA Fund Manager"), and vested in that entity the authority to negotiate and execute a loan on their behalf with Morgan Stanley Mortgage Capital Holdings, LLC ("Morgan Stanley"). They named Edward Okun as Manager of IPA Fund Manager. Okun executed a loan, mortgage, and reserve security agreement with Morgan Stanley.

IPA Fund Manager, under the terms of its authority, was not allowed to hold an ownership interest in any of the twenty limited liability companies; it is not clear from the terms of the contract whether Okun, in his individual capacity, was precluded from an ownership interest, as well.

Morgan Stanley decided to sell the loan, ultimately agreeing to sell it to an Okun-controlled entity, IP of A 5201 Lender, LLC ("IPA Lender"). As it structured the sale, Morgan Stanley agreed to offset the purchase price of the loan by the amount of funds available in several escrow, reserve, and impound accounts (hereinafter "the escrow accounts"), in which it held a security interest and which were, under the terms of the loan with the Investors, required to reimburse the Investors for maintenance, taxes, and other property-related expenses. IPA Lender, now holding the loan, never reestablished the escrow accounts, depriving the Investors of $1,361,184.63 in which they, too, had an interest.

Having abandoned their suit against Okun-controlled IPA Lender, the Investors claim that Morgan Stanley,

by allowing IPA Lender to use the escrow funds to finance its purchase of the loan, breached their loan agreement and committed conversion. The district court granted summary judgment for Morgan Stanley. We affirm the district court's ruling.

## I. Background

The appellee, Morgan Stanley Mortgage Capital Holdings, LLC, has one member, Morgan Stanley Capital, Inc., a Delaware corporation with its principal place of business in New York. As a limited liability company shares the citizenship of its members, the appellee is a citizen of Delaware and of New York. *See Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 424 (7th Cir. 2010); *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007). The appellants are twenty limited liability companies, IP of A West 86th Street 1-20. Each plaintiff LLC has one member, none of whom are citizens of either Delaware or New York. Accordingly, the parties are completely diverse, and, with the amount in controversy exceeding $75,000, subject-matter jurisdiction is secure under 28 U.S.C. § 1332.

### A. Factual Background

The twenty LLCs in this case were formed in 2005 for the express purpose of holding a fractional interest as tenants in common in commercial real estate located at 5201 West 86th Street, Indianapolis, Indiana.

In 2004, the Investors paid $12,650,000 to buy the property. They paid a $6,550,000 down payment and secured a $7,100,000 loan from Dise Group, LLC. Combined, the down payment and the loan exceeded the cost of the property by $1,000,000. The extra money was placed into escrow accounts.

### 1.  Investors' Refinancing Agreement with Morgan Stanley

In 2005, Morgan Stanley refinanced the loan by lending the Investors $7,100,000, of which $6,100,000 was used to refinance the property and of which $1,000,000 was deposited in the escrow accounts. This transaction was memorialized by a promissory note ("Note"), a mortgage and security agreement ("Mortgage"), and a reserve and security agreement ("RSA"). Each of these documents incorporated the terms of the others. Morgan Stanley required that a single agent sign these loan documents and otherwise act on behalf of the Investors.

In turn, each LLC executed a Consent of Co-Owners ("Investors' Consent") and an amendment to its Limited Liability Company Operating Agreement ("LLC Amendments"). In short, they delegated limited authority to sign and perform under the loan documents to IPA Fund Manager. IPA Fund Manager was a distinct limited liability company managed by Edward Okun.

The Investors' Consent stated, in relevant part:

> [T]he Co-Owners hereby authorize IPofA Fund Manager, LLC, a Virginia Limited liability company (in-

cluding its manager, Edward H. Okun), in its capacity as Vice President of each of the undersigned Co-Owners, to execute in the name of and on behalf of each fo the Co-Owners, and to deliver in connection with the Loan that certain Promissory Note, Mortgage and Security Agreement, Assignment of Leases and Rents, Environmental Indemnity Agreement, Memorandum of Master Lease, Memorandum of Tenants in Common Agreement, and any and all commitments, pledges or assignments of any other collateral, indemnities, certificates, affidavits, financing statements, applications, notices and other instruments, agreements or certificates related to the Loan, and to take from time to time any other actions necessary to effect the transactions contemplated above, upon the terms and conditions identical in all material respects to those terms and conditions set forth in the commitment letter attached hereto as Exhibit A, and the execution and delivery of such agreements and documents by such Vice President shall constitute conclusive evidence that the terms and conditions contained in said documents or instruments have been approved on behalf of the Co-Owners pursuant to this Consent. . . . [A]ny and all other actions heretofore taken by any member, manager, or authorized representative of the Vice President to execute and deliver any of the agreements authorized by the foregoing resolution or to take any of the actions authorized by the foregoing resolution are hereby approved, ratified, and confirmed in all respects. No further action is consented or taken.

The LLC Amendments stated, in relevant part:

> 3.02 Officers. The Company shall have one officer, which shall be a vice president. The Vice President shall have no voting rights nor have any ownership interest in the Company. The sole responsibilities of the Vice President shall be to execute the Loan Documents on behalf of the Company pursuant to the [Delaware Limited Liability Company] Act or any successor statute in conjunction with its re-financing of the Interest. . . . Notwithstanding any other provision of this Agreement, the Vice President, without any further action of the Company or the Member is hereby authorized to execute the Loan Documents . . . on behalf of the Company. . . . *Third parties dealing with the Company shall be entitled to conclusively rely on the signature of the Vice President as evidence of the authority of the Vice President to execute the Loan Documents on behalf to the Company and to bind the Company.*
>
> 3.05 Authorization. The Company, and the Member or the Vice President on behalf of the Company, may execute, enter into, deliver, and perform the Loan Documents and all documents, agreements, certificates or financing statement [sic] contemplated thereby or related thereto . . . , *all without any further act, vote or approval of any Member of [sic] other Person* notwithstanding any other provision of this Agreement, the Act or applicable rule or regulation.

(emphasis added).

## 2.  Morgan Stanley Sells the Loan to Okun

Morgan Stanley intended to resell its loan. Proving unsuccessful with third-party buyers, however, it agreed to sell the loan to Okun. Okun purchased the loan through an entity he controlled, IPA Lender.

On August 11, 2006, Morgan Stanley assigned the Note, Mortgage, RSA, and escrow accounts to IPA Lender. The Mortgage assignment stated that Morgan Stanley:

> [G]rant[ed], bargain[ed], s[old], convey[ed], assign[ed], transfer[red], and set over, without recourse, represen-tation, or warrant, all of [its] right, title, and interest, of any kind whatsoever, including that of mortgagee, beneficiary, payee, assignee, or secured party . . . , in and to the . . . [Mortgage] . . . ; *Together with the bonds or notes or obligations described in said Mortgage . . . ,* and the monies due and to grow thereon with the interest, and any and all other related security instru-ments which secure the indebtedness and/or obliga-tions secured by said Mortgage . . . .

(emphasis added). IPA Fund Manager—still managed by Okun and his associate, Lara Coleman—executed Bor-rowers' Escrow Instructions in connection with the sale, which, in pertinent part, provided:

> In connection with the sale of the Loan by [Morgan Stanley] to [IPA Lender], [IPA Fund Manager] hereby releases all escrow, reserve and/or impound accounts ("Escrows") of any nature related to the Loan and transfers all of such Escrows to . . . [Morgan Stanley] to have and to hold the same forever.

Lara Coleman, Okun's associate and a manager at IPA Lender, was the only signatory on these instructions. According to the Investors, this provision modified Sections 3.4 and 5.1 of the RSA, which stated:

> Borrower understands and agrees that, in connection with any sale of the Loan pursuant to Section 18.1 of the Security Instrument, all of Lender's interest in the Reserves and the Reserve Escrow Accounts will by assigned to the transferee of the Loan. . . . Upon the earlier of (a) Borrower's completion of all Repairs to the satisfaction of the Lender . . . or (b) payment in full of all sums evidenced by the Note, Lender shall disburse to Borrower all remaining funds in the Replacement Reserve, and the Tenant Improvements and Leasing Commission Reserve.

When Morgan Stanley sold the loan to IPA Lender, it held several escrow accounts totaling $1,361,184.63. Morgan Stanley "netted" the escrow funds against the purchase price of the loan, meaning that it credited this amount against the amount IPA Lender owed. Simply put, Morgan Stanley permitted IPA Lender to use the reserve funds to pay part of the purchase price and, thereafter, was uninvolved with the Investors' loan.

### 3. Okun Stops Making Payments to the Investors and Assigns the Loan to Cordell Consultants

Three weeks after purchasing the loan, IPA Lender assigned it, as well as the escrow accounts, to another entity as security for a $6,000,000 loan. It discharged

the assignment in November 2006. A month after this assignment, the IPA Lender pledged the loan as consideration for a $2,500,000 loan to it from Cordell Consultants, Inc.

In July 2007, Okun stopped making monthly payments to the Investors, and his companies sought bankruptcy protection. Cordell Consultants became the owner of the loan.

The Investors then stopped making payments to Cordell Consultants, and Cordell Consultants brought foreclosure proceedings against the property at 5201 West 86th Street. The Investors agreed to sell the property to a Cordell Consultants-owned company in consideration for its discharge of their obligations under the loan documents.

Okun, in 2008, was convicted of wire and mail fraud, conspiracy, and other crimes.

**B. Procedural Background**

The Investors first sued Okun-controlled IPA Lender, claiming that it took the escrow accounts and, thus, committed breach of contract and conversion. They dropped this suit.

The Investors then sued Morgan Stanley in Marion County Superior Court, claiming damages for breach of contract and conversion. They requested treble damages and attorney's fees on the conversion claim, as well.

Morgan Stanley removed the case to the United States District Court for the Southern District of Indiana. Both

the Investors and Morgan Stanley moved for summary judgment.

The district court denied the Investors' motion for summary judgment and granted Morgan Stanley's. The Investors presently appeal.

## II. Discussion

We review a grant or denial of summary judgment de novo. *See Egan Marine Corp. v. Great American Ins. Co. of New York*, 665 F.3d 800, 811 (7th Cir. 2011). Summary judgment is appropriate when no issue of material fact exists to be tried, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see Egan Marine*, 665 F.3d at 811 (citing *Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010)). Once a party moves for summary judgment, the burden falls to the non-moving party to "marshal and present the court with the evidence [that] . . . will prove her case," *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010), and which reveals an issue of material fact still in dispute. As we examine the record, the Court considers all facts and draws all reasonable inferences in the light most favorable to the non-moving party. *See Egan Marine*, 665 F.3d at 811 (citing *Egan v. Freedom Bank*, 659 F.3d 639, 640-41 (7th Cir. 2011)).

## A. The District Court Correctly Granted Summary Judgment for Morgan Stanley

The documents governing the loan between the Investors and Morgan Stanley—the Note, the Mortgage, and the RSA—each state that "the laws of the state in which the Property is located" apply. Accordingly, Indiana law controls in this case. *See United States v. Kashamu*, 656 F.3d 679, 684-85 (7th Cir. 2011) ("Ordinarily a court will enforce the choice of law rule selected by the parties, no questions asked, unless they select a foreign law that would be too difficult for the federal court to apply . . . ."); *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011) ("As for which state's law applies . . . we normally respect the law chosen in the . . . agreement.").

### 1. Investors' Breach of Contract Claim

The Investors may sustain a breach of contract claim against Morgan Stanley if (1) a contract existed between them; (2) Morgan Stanley breached that contract; and (3) the breach resulted in damages. *See Haegert v. Univ. of Evansville*, 955 N.E.2d 753, 758 (Ind. Ct. App. 2011) (citing *Ruse v. Bleek*, 914 N.E.2d 1, 11 (Ind. Ct. App. 2009)).

The Investors and Morgan Stanley agree that the Note, the Mortgage, and the RSA constitute contracts between them. Morgan Stanley contends that the Borrowers' Escrow Instructions also constitutes a contract between them, but the Investors challenge this document as executed without their requisite authorization. Both parties disagree on the issues of breach and damages.

According to the Investors, Morgan Stanley breached the RSA. That document, they posit, allowed Morgan Stanley to assign its interest in the escrow funds to a buyer, not apply the funds to its sale of the loan. Morgan Stanley could not "net" the funds without breaching its agreement with the Investors unless it was authorized to do so by the Borrowers' Escrow Instructions. Although the instructions released their interest in the escrow accounts to Morgan Stanley, the Investors argue that IPA Fund Manager did not have authority to execute them. As IPA Fund Manager lacked the authority or apparent authority to release the escrow funds to Morgan Stanley, they claim, Morgan Stanley could not "net" the escrow accounts without breaching the RSA.

Morgan Stanley argues that it did not breach the RSA. The loan documents, it argues, unambiguously afforded it the right to sell the loan without notice to the Investors and without their consent, as well as to assign its rights in the escrow accounts to the buyer. In particular, Morgan Stanley argues that after it assigned its rights and delegated its obligations in the escrow accounts to the loan's buyer, the new buyer was bound, as it was, by the original loan documents: IPA Lender was required to set up reserve accounts for the Investors' benefit. In Morgan Stanley's view, it cannot be held liable for Okun's fraud or failure to comply with the terms of the loan documents. It never authorized or purported to authorize IPA Lender to raid the escrow accounts to finance its purchase of the loan.

### a. Morgan Stanley Did Not Breach the RSA

Summary judgment on a breach of contract claim can be appropriate when the terms of the contract are clear and straightforward. *Haegert*, 955 N.E.2d at 758. If ambiguity exists, the appropriate construction is an issue of material fact meriting trial and within the province of a trier of fact. *Id.* Under Indiana law, a contract is ambiguous "only if reasonable persons would differ as to the meaning of its terms." *Id.* (citing *Trs. of Ind. Univ. v. Cohen*, 910 N.E.2d 251, 257 (Ind. Ct. App. 2009)). Moreover, "in the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction will be construed together in determining the contract." *Gold v. Cedarview Mgmt. Corp.*, 950 N.E.2d 739, 743 (Ind. Ct. App. 2011) (quoting *Salcedo v. Toepp*, 696 N.E.2d 426, 435 (Ind. Ct. App. 1998)).

The parties do not dispute that IPA Fund Manager was authorized to execute the Note, the Mortgage, and the RSA with Morgan Stanley and that both the Investors and Morgan Stanley were bound by the terms of those documents. As an initial matter, the terms of the Note and the Mortgage make clear that Morgan Stanley had a right to transfer the loan without the Investors' knowledge or consent. The loan, represented by the Note, was "secured by that certain Mortgage and Security Agreement . . . in the principal sum of $7,100,000 given by [the Investors] to (or for the benefit of) [Morgan Stanley] . . . ." The Mortgage and Security Agreement reiterates this relationship in Section 1.3, in which it states:

> This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of [Investors]. By executing and delivering this Security Instrument, [the Investors] hereby grant[] to [Morgan Stanley], as security for the Obligations (defined in Section 2.3), a security interest in the Personal Property to the full extent that the Personal Property may be subject to the Uniform Commercial Code.

The Note and the Mortgage unambiguously grant Morgan Stanley a mortgage and security interest in the Investors' property. According to Section 18.1 of the Mortgage, Morgan Stanley enjoyed the right to "at any time, sell, transfer, or assign the Note, this Security Instrument and the Other Security Documents, and any and all servicing rights with respect thereto . . . ."

The RSA expressly granted Morgan Stanley a security interest in the escrow funds, as well as granted it a right to assign those funds as it wished. In Section 3.1 of the RSA, the Investors "pledge[d], assign[ed], and grant[ed] a security interest to [Morgan Stanley] . . . in all of [the Investors'] right, title and interest in and to each of the Reserve Escrow Accounts and each of the Reserves . . . ." In Section 3.4, the Investors unambiguously represented that they "underst[ood] and agree[d] that, in connection with any sale of the Loan pursuant to Section 18.1 of the [Mortgage], all of [Morgan Stanley's]

interest in the Reserves and Reserve Escrow Accounts will be assigned to the transferee of the Loan." The only questions before us, then, are (1) whether Morgan Stanley's right to "assign" its interest in the escrow accounts under the RSA included the right to "net" the escrow accounts, and (2) if not, whether that right was permissibly granted under the Borrowers' Escrow Instructions.

The Investors suggest that by allowing IPA Lender to use the escrow funds to pay for the loan, Morgan Stanley did something other than assign its interest in the funds. The Note, Mortgage, and RSA do not define the term "assign." On appeal, however, the Investors advance, and Morgan Stanley accepts, the term's conventional legal definition: "a transfer which confers a complete and present right in a subject matter to the assignee." *See Brown v. Ind. Nat. Bank*, 476 N.E.2d 888, 894 (Ind. Ct. App. 1985).

Per the terms of Morgan Stanley's transaction with IPA Lender, an assignment unambiguously transpired. *See supra* Part I.A.2. In addition to assigning its interest, however, Morgan Stanley also delegated to IPA Lender its obligations under the Note, Mortgage, and RSA. *See supra* Part I.A.2. The loan's sale terms clearly imposed upon IPA Lender the responsibilities vis-à-vis the escrow accounts that Morgan Stanley held before the loan's sale. In particular, IPA Lender was bound to comply with the RSA and maintain the escrow accounts as dictated by its terms. Those terms make clear that Morgan Stanley—and now IPA Lender—was not re-

quired to treat those funds as a trust or avoid commingling funds. Contrary to the Investors' claims, the RSA did not grant to the Investors an interest in each unique dollar in the funds—only in the account totals.

Accordingly, when Morgan Stanley agreed to "net" or credit IPA Lender the value of the cash in the accounts against the sale price, it did not agree to let IPA Lender pirate the escrow accounts. It permitted IPA Lender to use the dollars in the accounts, now under its control, to pay for the loan. In doing so, it was entitled to assume and expect that IPA Lender would abide by the terms of the transaction, and ensure any dollar taken out of the accounts for the sale would be immediately replaced such that the escrow account totals remained unaffected.

The Investors challenge twofold that the obligations vis-à-vis the escrow accounts remained with Morgan Stanley. First, they argue that, under Indiana law, Morgan Stanley could not transfer its obligations to IPA Lender without their consent, which they did not give. Second, they argue that Section 3.4 of the RSA obligated Morgan Stanley to ensure that IPA Lender replaced the funds and that, as a result, Morgan Stanley should have transferred the actual cash in the accounts upon assigning its interest in them to IPA Lender.

Regarding their first argument, the Investors direct us to *Navin v. New Colonial Hotel*, 90 N.E.2d 128, 133-34 (Ind. 1950), in which the Indiana Supreme Court held that a party cannot assign away his liabilities without the consent of his adversary party. *See also Nelson v.*

*Reidelbach*, 119 N.E. 804, 806 (Ind. Ct. App. 1918) ("It is a general rule that rights arising out of a contract cannot be transferred if they are coupled with liabilities . . . such that the party whose agreement conferred the rights must have intended them to be exercised only by him in whom he actually confided."). They maintain that they did not consent to such an assignment by Morgan Stanley. The Investors, however, overlook that they fostered in IPA Fund Manager—and Okun—the authority, or at least apparent authority, to consent on their behalf to such an assignment. *See supra* Part I.A.1. Section 3.02 of the LLC Amendments states, "Third parties dealing with the Company shall be entitled to conclusively rely on the signature of the Vice President as evidence of the authority of the Vice President to execute the Loan Documents on behalf to the Company and to bind the Company." *See id*. The Investors' Consent identifies IPA Fund Manager as the Vice President. *See id.* As such, when IPA Fund Manager authorized the assignment—of both Morgan Stanley's rights and its obligations—to IPA Lender, Morgan Stanley obtained the consent of its adversary party and complied with the *Navin* Court's edict. Whether or not IPA Fund Manager was permitted to grant this authorization to Morgan Stanley does not alter the fact that Morgan Stanley was permitted to rely on IPA Fund Manager's representations that it was so empowered.

Furthermore, we do not agree that Section 3.4 imposed an obligation upon Morgan Stanley to verify that IPA Lender reconstituted the escrow accounts. That section

manifests the Investor's consent to Morgan Stanley transferring its interest in the escrow accounts to the buyer of the loan; it levies no additional requirements upon Morgan Stanley. *See supra* Part II.A.1.a. We decline to construe the terms of the agreement such that Morgan Stanley would have avoided breach had it physically transferred the funds to IPA Lender and then accepted the same funds back into its coffers immediately after, but committed breach because it skipped that formalistic step and deducted the balance of the accounts from the purchase price. The fact that IPA Lender did not comply with its end of the transaction or fulfill its obligations toward the escrow accounts does not render Morgan Stanley's assignment anything other than an assignment. Morgan Stanley had already performed under the terms of the RSA when IPA Lender, now bound by the RSA's obligations, allegedly breached its terms.[1]

---

[1] Morgan Stanley assigned its interest and delegated its obligations to IPA Lender as permitted by the RSA, *see supra* Part II.A.1.a. Consequently, we do not examine the legitimacy of the Borrowers' Escrow Instructions or their impact on the assignment between Morgan Stanley and IPA Lender, except to note that the terms of those instructions do not wrest from the Investors their interest in the escrow accounts. The plain language of the instructions authorizes only the transfer of the funds between Morgan Stanley and IPA Lender.

### b. Damages

Finding no breach of contract on the part of Morgan Stanley, we do not examine the issue of damages.

### 2. Investors' Conversion Claim

Indiana's criminal conversion statute states that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion . . . ." IND. CODE § 35-43-4-3(a). Indiana law permits a plaintiff to bring a civil conversion claim under its criminal conversion statute. *See* IND. CODE § 34-24-3-1 ("If a person . . . suffers a pecuniary loss as a result of a violation of IC 35-43 . . . , the person may bring a civil action against the person who caused the loss . . . ."). To prevail on their civil conversion claim, the Investors must prove the elements of the criminal conversion claim by a preponderance of the evidence. *See SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 766 (Ind. Ct. App. 2011). In particular, they must prove that Morgan Stanley knowingly or intentionally exerted unauthorized control over their property, and that they suffered pecuniary loss as a result of this unauthorized control.

The Investors claim when Morgan Stanley allowed Okun to apply the balance of the escrow accounts against the purchase price of the loan, it committed conversion. They contend that Morgan Stanley knew, by virtue of its participation in drafting and executing the loan documents, that the Investors retained an interest in those

accounts. Morgan Stanley, they maintain, held the funds in those accounts as a fiduciary for them. In their view, it had no right to offset the loan's purchase price with those funds, and it knowingly exercised unauthorized control when it did so.

Morgan Stanley counters, first, that the Investors are raising their breach of fiduciary duty argument for the first time on appeal and, thus, have waived it. Second, it argues that the fiduciary duty analysis on which the Investors rely does not apply in the context of the mortgage transaction. Finally, it challenges that the Investors have failed to prove that it knowingly lacked authorization to offset the purchase price with the escrow funds.

### a. Waiver

During the proceedings below, the Investors based their conversion claim on the fact that Lara Coleman, not Okun, signed the Borrowers' Escrow Instructions when she lacked authorization to do so. They argued that Morgan Stanley required Borrowers' Escrow Instructions to allow Okun to use the escrow funds to pay for the loan, and, accordingly, that Morgan Stanley knowingly prompted unauthorized control over the fund and caused their pecuniary loss. The argument below does not frame Morgan Stanley's conduct as a breach of fiduciary duty, so we find the argument waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district court are waived on appeal.").

### b.   Unauthorized Control Over the Escrow Funds

Assuming arguendo that the Investors preserved their breach of fiduciary duty claim, however, their argument fails. The Investors suggest that Morgan Stanley was not authorized to "net" the escrow funds against the loan's purchase price and that it knew it was not authorized to do so. They predicate their argument on Morgan Stanley's purported fiduciary duty to them, suggesting that Morgan Stanley could disburse the funds only in their interest and with their explicit permission.

First, IPA Lender, if anyone, exercised unauthorized control over the funds in the escrow accounts. Yet, were this not the case, the Investors cannot establish a fiduciary relationship between themselves and Morgan Stanley. Under Indiana law, a "mortgagor/mortgagee relationship[] . . . do[es] not transform a traditional debtor-creditor relationship into a fiduciary relationship absent an intent by the parties to do so." *Paul v. Home Bank SB*, 953 N.E.2d 497, 504 (Ind. Ct. App. 2011) (quoting *Wilson v. Lincoln Fed. Sav. Bank*, 790 N.E.2d 1042, 1046-47 (Ind. Ct. App. 2003)). Section 6.1 of the Mortgage expressly disavows such a relationship, stating,

> The relationship between [the Investors] and [Morgan Stanley] is solely that of debtor and creditor, and [Morgan Stanley] has no fiduciary or other special relationship with [the Investors], and no term or condition of any of the Note, this Security Instrument, and the Other Security Documents shall be construed so as to deem the relationship between [the Investors] and [Morgan Stanley] to be other than that of debtor and creditor.

Per the express terms of their agreement, the Investors cannot demonstrate that Morgan Stanley owed them any fiduciary duty. *See id.* ("Absent special circumstances, a lender does not owe a fiduciary duty to a borrower."). Morgan Stanley enjoyed an independent security interest in the escrow accounts and did not hold the funds as a fiduciary for them. Consequently, they cannot prove that Morgan Stanley exercised unauthorized control of the accounts on this basis.

Notably, Section 3.4 of the RSA further undermines the Investors' unauthorized control argument. In that section, the Investors represented that "[they] underst[ood] and agree[d] that, in connection with any sale of the Loan pursuant to Section 18.1 of the Security Instrument, all of [Morgan Stanley's] interest in the Reserves and the Reserve Escrow Accounts will be assigned to the transferee of the Loan." Simply put, the Investors gave Morgan Stanley express permission to assign its interest in the escrow accounts to whoever purchased the loan, and they imposed no restrictions on the means by which it structured that assignment—applying the total in the funds against the purchase price of the loan is not prohibited under the RSA, particularly given that commingling funds was permitted under its terms.

At best, the Investors may argue that Morgan Stanley was not authorized to assign the funds to Okun or his entities because he was the manager of IPA Fund Manager, which was forbidden from holding an ownership interest in the twenty limited liability companies for whom it acted. *See supra* Part I.A.1. Yet, regardless of

whether the Investors' Consent and LLC Amendments precluded Okun, in his individual capacity or through different entities, from taking a putative ownership interest in the Investors' companies by holding their loan, Morgan Stanley was not a party to either of those contracts. Therefore, Morgan Stanley did not commit any unauthorized control by assigning its interest in the funds to the Okun-controlled entity, IPA Lender.

Because the Investors cannot prove unauthorized use, we need not examine the scienter and causation elements of their conversion claim. They cannot prevail.

Morgan Stanley was not barred by the Note, the Mortgage, or the RSA from assigning its interest in the escrow accounts to Okun or structuring a sale of the loan as it wished. We conclude that Morgan Stanley committed neither breach of contract nor conversion and was entitled to judgment as a matter of law. The district court correctly granted its motion for summary judgment.

### B. The District Court Properly Denied the Investors' Motion for Summary Judgment

Because the district court properly granted summary judgment for Morgan Stanley, it appropriately denied the Investors' motion for summary judgment.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court.