**John HAEGERT, Appellant–Plaintiff,**

v.

**UNIVERSITY OF EVANSVILLE,
Appellee–Defendant.**

No. 82A01–1008–PL–369.

Court of Appeals of Indiana.

Sept. 19, 2011.

Rehearing Denied Dec. 2, 2011.

754

KIRSCH, Judge.

The Vanderburgh Superior Court granted summary judgment in favor of the University of Evansville ("the University") in an action filed by John Haegert ("Haegert"), alleging that the University's decision to terminate him for violation of its sexual harassment policy was a breach of his tenure contract. Haegert appeals from the trial court's order, arguing that the trial court erroneously entered summary judgment in favor of the University and erroneously denied his motion for summary judgment.

We reverse and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

Haegert joined the University's staff in 1979, received tenure there in 1982, and, in 1992, became a full professor of English, specializing in, among other things, American Literature and Twentieth–Century British Literature. Margaret McMullan ("McMullan") joined the University's faculty in 1990, and was a member of the University's English Department, specializing in creative writing. In the summer of 2000, the University promoted McMullan, then an assistant professor, to acting chair of the English Department. She was promoted to permanent department chair in 2002, and as such was responsible for Haegert's teaching performance evaluation. She also was responsible for coordinating student recruiting and overseeing the pairing of English majors with faculty advisors specializing in the student's primary area of interest. McMullan asked

1. We held oral argument in this case on May 18, 2011 in the Indiana Court of Appeals Courtroom in Indianapolis, Indiana. We commend counsel for the quality of their written and oral advocacy.

Mike Carson ("Carson"), the previous department chair, and two other professors to advise students whose focus was on literature. Haegert had asked McMullan if he could advise literature students, but on the advice of and information received from Carson and Stuart Dorsey ("Dorsey"), the University's Vice President of Academic Affairs, that Haegert was a poor advisor, McMullan declined to allow him to advise students.

In 2002, McMullan received informal complaints from female students about some of the language Haegert used in the classroom and inappropriate touching of students. When McMullan became the department chair, Carson gave her his files containing notes about and evaluations of professors in the department. McMullan maintained those files and also made notes of unusual or significant incidents that were reported to her that might be relevant to faculty members' evaluations. Notes about those informal complaints were maintained in McMullan's "anecdotal file" on Haegert. During approximately the same time period, the University's Affirmative Action Officer, Jennifer Graban ("Graban"), received informal complaints from students about Haegert's use of terms of endearment and hugging of female students. As no formal complaints had been lodged against Haegert, Graban could not commence an investigation into the complaints. Graban, however, believed that Haegert should be notified about the informal complaints so that he could adjust his behavior. Both McMullan and Graban had conversations with Haegert about the informal student complaints. McMullan and Graban both believed that Haegert was agitated by this information and was more concerned with finding out which students had complained than with adjusting his behavior.

The University's tenure contracts incorporate by reference the University's Faculty and Administrator Manual ("the Manual"), and the Manual is amended from time-to-time. In March 2004, the University and Haegert executed a tenure contract for the 2004–2005 academic year, and Haegert agreed to abide by the rules and obligations imposed by the University, which included the University's no-tolerance harassment and sexual harassment policies. Haegert was aware that violation of this tenure contract would be cause for the University to terminate his employment. Neither the faculty tenure contracts nor the Manual contained a provision giving faculty members the right to advise or recruit students. Faculty members whose employment had been terminated were not given the right, by contract or the Manual, to enter the University's campus or to attend campus events.

On August 25, 2004, the first day of the 2004–2005 academic year at the University, McMullan was seated in the English Department lounge interviewing a prospective student, Cassandra Stichter, and her parents. McMullan asserts that Haegert walked over to where McMullan was seated and stood directly in front of her with his belt at her eye level about a foot from her face, said "Hi, Sweetie" and then "touched and moved his fingers on [McMullan's] neck and chin in a tickling gesture for a long moment *while* [she] was addressing the prospective family." *Appellant's App.* at 474 (emphasis in original). McMullan claims that she was stunned and offended by Haegert's behavior, as were the Stichter family and the female student who had accompanied Haegert into the lounge. Because she was in the midst of an interview, McMullan did not immediately comment on Haegert's behavior. The Stichters cut the interview short even though there were still twenty to thirty minutes of the interview remain-

ing. Cassandra Stichter did not enroll at the University.

Haegert's version of the events that transpired is quite different. Haegert asserts that on that day he was in an extremely joyful mood because he had just learned that his wife was free of cancer. He states that when he walked into the English Department lounge with a student, he was warmly greeted by McMullan. He then walked over to McMullan saying "Hi, Sweetie. How is my favorite chair?" and gave her a chuck under the chin. *Id.* at 91. Haegert and the student who had accompanied him then entered his office, where he noisily, but accidentally, dropped his briefcase.

McMullan spoke with Dorsey later that day to express that she was offended by Haegert's conduct and indicated that she wanted to file a formal complaint against Haegert. Dorsey instructed McMullan to send an e-mail to him detailing her complaint. McMullan sent an e-mail to Dorsey as instructed and forwarded the same e-mail to Graban.

On August 26, 2004, McMullan met with Graban and filed a formal complaint of harassment against Haegert with the University. Revisions were made to the text of the e-mail, which was copied into the complaint form, and McMullan signed the formal complaint against Haegert. Graban immediately began an investigation into McMullan's complaint. Graban contacted the Stichter family to obtain their account of the incident in question. Ken Stichter, the prospective student's father, described Haegert's behavior during the telephone conversation, and later confirmed his description of the account, which had been reduced to writing by Graban, in a letter. Haegert was notified that a formal complaint had been filed by McMullan against him and he was placed on administrative leave with pay pending the outcome of the investigation.

Graban convened a Review Committee, comprised of herself, the current ombudsperson, and a faculty member. The Review Committee interviewed both Haegert and McMullan. Prior to McMullan's interview she refreshed her recollection of past incidents involving Haegert by looking at her "anecdotal file" on him, and gave the file to Graban. McMullan described the August 25, 2004 incident in detail and answered the Review Committee's questions about prior incidents where Haegert's behavior had been questioned.

During Haegert's interview, he admitted calling McMullan "Sweetie" and chucking her under her chin. His version minimized both the importance and significance of the incident. When asked by the Review Committee about the prior informal student complaints, Haegert denied any wrongdoing with either students or McMullan.

The Review Committee unanimously concluded that Haegert's behavior with respect to the August 25, 2004 incident violated the University's no-tolerance sexual harassment policy, also concluding that there was sufficient evidence to support the alleged violation. The Review Committee then forwarded its report of the investigation to University President Stephen Jennings ("Jennings").

Jennings met with Haegert in an effort to resolve the matter informally, but Haegert rejected the efforts made to reach an informal resolution, which included the opportunity to retire. Jennings then brought the formal complaint before the University's Faculty Professional Affairs Committee ("FPAC"), which was comprised of approximately twelve elected faculty representatives, none of whom had served on the Review Committee. Haegert submitted an e-mail to FPAC in his

defense. The FPAC unanimously concluded, however, that the facts surrounding McMullan's complaint constituted adequate cause to terminate Haegert's employment with the University.

After receiving the FPAC's findings, Jennings decided to terminate Haegert's employment because of the August 25, 2004 incident involving McMullan. Haegert appealed the finding of sexual harassment and his termination with the Faculty Appeals Committee ("FAC"). The FAC held an evidentiary hearing of Haegert's appeal at which both Haegert and the University were represented by counsel. Each party had the ability to call and examine witnesses and present evidence.

The University was represented by Tom Magan ("Magan"), who met with McMullan prior to the evidentiary hearing. Magan requested that McMullan supply to him her "anecdotal file" on Haegert, and McMullan complied with his request. McMullan was called as a witness at the FAC evidentiary hearing by both the University and Haegert. Magan did not introduce McMullan's "anecdotal file" as evidence during the hearing.

At the conclusion of the evidentiary hearing, the FAC unanimously concurred with the decision to terminate Haegert's employment with the University. Jennings then notified Haegert that his termination had been upheld, that he was banned from the University's campus and events, and that his pay and benefits would terminate effective March 31, 2005. Haegert appealed the FAC's decision to the University's Board of Trustees, and had his counsel prepare a brief for the Board of Trustees on his behalf. The Board of Trustees unanimously concurred with the decision to terminate Haegert's employment concluding that he had violated the University's harassment policy.

On August 25, 2005, Haegert filed a complaint alleging breach of contract and tortious breach of contract against the University. The University filed a motion for summary judgment on January 12, 2009. Haegert filed his own motion for summary judgment the following day. On September 13, 2009, Haegert filed a motion to strike and brief in support regarding alleged hearsay relied upon by the University in its motion for summary judgment.

On June 11, 2010, the trial court heard oral argument on the motions for summary judgment, and on July 2, 2010, made the following minute entry:

> The Court having had these matters under consideration, now enters the following rulings: (1) Deft University of Evansville's Motion for Summary Judgment on Pltf's Tortious Breach of Contract claim is granted. (2) Pltf's Motion for Summary Judgment is denied. Formal entry to be furnished by Counsel for Deft.

*Id.* at 2. On July 8, 2010, the trial court made the following entry: The Court intended to enter summary judgment on the breach of contract claim in its earlier ruling. *Id.* at 1. Then on July 15, 2010, the trial court entered an order, which reads as follows:

> ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (7–2–10)
>
> This matter having come before the Court on Defendant University of Evansville's Motion for Summary Judgment, and the Court, after having reviewed same, hereby finds that said Motion is meritorious and should be granted.
>
> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED
>
> that Plaintiff's claims should be, and hereby are, dismissed with prejudice

and summary judgment is entered in favor of Defendant, University of Evansville, on this 15 day of July, 2010.

Signed J. Douglas Knight

JUDGE, Vanderburgh Circuit Court

*Id.* at 1. Haegert now appeals.

## DISCUSSION AND DECISION

Haegert appeals from the trial court's order granting summary judgment in favor of the University and denying his motion for summary judgment. Our standard of review of a summary judgment order is well-settled: summary judgment is appropriate if the "designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). Relying on specifically designated evidence, the moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *I/N Tek v. Hitachi Ltd.*, 734 N.E.2d 584, 586 (Ind.Ct. App.2000). If the moving party meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing that there is a genuine issue for trial. *Id.* A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Gilman v. Hohman*, 725 N.E.2d 425, 428 (Ind.Ct.App.2000). Even if the facts are undisputed, summary judgment is inappropriate where the record reveals an incorrect application of the law to the facts. *Id.*

■ A trial court's grant of summary judgment is clothed with a presumption of validity, and the party that lost in the trial court has the burden of demonstrating that the grant of summary judgment was erroneous. *City of Indianapolis v. Byrns*, 745 N.E.2d 312, 316 (Ind.Ct.App.2001). On appeal, we are bound by the same standard as the trial court, and we consider only those matters that were designated at the summary judgment stage. *Interstate Cold Storage v. Gen. Motors Corp.*, 720 N.E.2d 727, 730 (Ind.Ct.App.1999). We do not reweigh the evidence, but we liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact for trial. *Estate of Hofgesang v. Hansford*, 714 N.E.2d 1213, 1216 (Ind.Ct.App.1999). A grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Bernstein v. Glavin*, 725 N.E.2d 455, 458 (Ind.Ct.App. 2000).

■ Generally, the construction of a written contract is a question of law for which summary judgment is particularly appropriate. *Trs. of Ind. Univ. v. Cohen*, 910 N.E.2d 251, 257 (Ind.Ct.App.2009). Contract interpretation presents a question of law subject to de novo review. *Id.* A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms. *Id.* When reasonable persons would find a contract susceptible of more than one construction, an ambiguity exists, which should be resolved by the trier of fact. *Id.* When the language of a written contract is not ambiguous, its meaning is a question of law for which summary judgment is particularly appropriate. *Id.*

■ The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Ruse v. Bleeke*, 914 N.E.2d 1, 11 (Ind.Ct.App.2009). Neither side challenges the existence of the employ-

ment contract between Haegert and the University. Rather, Haegert alleges that the University breached the contract and owes him damages for that breach. In particular, Haegert claims that the University breached its contract by: (1) re-characterizing McMullan's complaint against him as a complaint of sexual harassment; (2) violating his right to academic freedom; (3) unilaterally cancelling his 2004–05 contract and summarily dismissing him; (4) denying him tenure, a property right, without due process; (5) failing to follow the University's procedure for investigation of sexual harassment claims; (6) failing to follow the University's procedure for terminating tenured faculty members; (7) depriving him of his right as a member of the public to have access to the University's campus and University events; and (8) failing to pay his salary for the 2004–2005 academic year.

Because we find the issue to be dispositive here, we consider Haegert's argument that the entry of summary judgment in favor of the University was erroneous as the University failed to follow its own procedure for terminating tenured faculty members in the course of its investigation of McMullan's harassment claim against him. Haegert argues that the University breached his employment contract by denying him the procedures described in AAUP (American Association of University Professors) publications.

The Manual provides as follows regarding the dismissal of a faculty member with continuous tenure:

3.

a. In cases pertaining to the *dismissal of a faculty member with continuous tenure, or with a special or probationary appointment before the end of the specified term,* the Faculty Professional Affairs Committee will conduct an informal inquiry as specified by the Faculty Bylaws and in conformity with the 1982 Recommended Institutional Regulations on Academic Freedom and Tenure (with revisions). The Committee may, failing to effect an adjustment, determine whether in its opinion dismissal proceedings should be undertaken, without its opinion being binding upon the President. Subsequently, a dismissal will be preceded by a statement of reasons, and the individual concerned will have the right to be heard by the Faculty Appeals Committee serving as the duly elected faculty formal hearing committee.

8. Having exhausted all other avenues of appeal, the faculty member can ultimately ask that the Board of Trustees consider the grievance. This may be done by submitting a request in writing to the President who shall forward it to the chair of the Board of Trustees with a copy of the previous actions. The chair shall arrange for the case to be heard after all pertinent information has been studied. The faculty member will be permitted to appear in person and give whatever evidence desired in support of the appeal. Upon conclusion of its deliberation, the Board of Trustees shall decide whether to affirm or deny the appeal and shall so inform the faulty member in writing.

*Appellee's App.* at 165–66 (emphasis in original). The Faculty Bylaws contained in Manual provide in relevant part that

In all matters pertaining to academic freedom, tenure, and professional ethics, and to assure academic due process, the University adheres to the AAUP guidelines (AAUP, *Policy on Documents & Reports,* Eighth Edition, 1995, Washington, D.C.: AAUP) which include the following:

"1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments"

"Statement on Procedural Standards in Faculty Dismissal Proceedings" (1958)

"Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments" (1989)

"Recommended Institutional Regulations on Academic Freedom and Tenure" (1982).

*Id.* at 98. The Recommended Institutional Regulations on Academic Freedom and Tenure, www.aaup.org/AAUP/pubsres/policydocs/contents/RIR.htm?/PF=1 (last visited on July 21, 2011), contains the following statement of the burden of proof involved in the dismissal of a tenured professor:

(8) The burden of proof that adequate cause exists rests with the institution and will be satisfied only by *clear and convincing evidence in the record considered as a whole.*

*Appellant's App.* at 673 (emphasis supplied). We conclude that the University did not satisfy this burden of proof prior to terminating Haegert's employment.

This case is unique factually because it involves the allegation of sexual harassment by a subordinate of a superior. McMullan, as the chairperson of the department, faced no retribution for reporting Haegert's conduct. In fact, she was responsible for evaluating Haegert's work performance and for supervising him. Our research has led us to only one case holding that a supervisor could be victimized by a subordinate through sexual harassment in the form of hostile work environment, although there may be others. *See Hanlon v. Chambers,* 195 W.Va. 99, 464 S.E.2d 741 (1995) (West Virginia Human Rights Act imposes a duty on employers to keep workplaces free of sexual harassment from whatever source, co-worker, subordinates, customers, or superior).

It should also be noted that officials from the University stated that the sole reason Haegert's employment was terminated was because of the August 25, 2004 incident involving McMullan. The incident was investigated as sexual harassment in the form of hostile work environment. The Manual describes the following procedure for filing a formal claim of harassment or sexual harassment and the investigative, hearing, and review processes.

*B. Formal Harassment Complaint Procedure*

The formal complaint procedure is initiated by a person, here termed the complainant, containing the relevant allegations against a person, here termed the respondent, and requesting an investigation under the procedures provided below. The policy coordinator, if other than the AAO, forwards the complaint to the AAO. Neither the complainant nor the respondent may be represented by legal counsel.

. . . . If the respondent is not a student, the AAO will coordinate the procedure. In all cases the AAO is the official legally responsible for the investigation. If either the complainant or the respondent is not a student, the AAO, or in the absence of the AAO, the appropriate policy coordinator, shall adhere to the following procedure: 1). Convene a committee to review the charge and hear evidence and testimony during the investigation; 2). Serve as Chair of the committee and coordinator of the investigation; 3). Inform the complainant and the respondent of the committee's identity and charge, providing the respondent with a copy of the formal complaint; 4). Ensure that the investigation is conducted in a timely manner.

The review committee shall consist of the AAO, faculty and/or student ombudsperson, if a faculty or student is involved, a representative of the appropriate group if a staff member or administrator is involved, and one policy coordinator. Policy coordinators will assist the complainant and/ or respondent through the investigation process as needed. All officials involved in the investigation process will be trained in harassment issues. The AAO will have the discretion to add an additional member to the committee of investigation if deemed appropriate.

*Appellee's App.* at 132–33.

The University's policy on sexual harassment contains examples of sexually harassing behavior which include but are not limited to:

—Physical assault

—Unwelcome sexual advances, including unwanted touching, flirting, fondling, hugging, patting, pinching, or leering

—Verbal abuse or degrading propositions of a sexual nature including sexually-oriented jokes, kidding or teasing

—A sexually suggestive environment that interferes with the accomplishment of studies or work

*Id.* at 130. One of the problems with the treatment of sexual harassment is the failure to distinguish between assault and trivial behavior. This problem is magnified by zero-tolerance policies such as the one here, where the consequence for any of a range of behaviors can result in the termination of one's employment.

In *Haberman v. Cengage Learning, Inc.,* 180 Cal.App.4th 365, 103 Cal.Rptr.3d 19 (2009), the California Court of Appeals discussed what conduct constituted the hostile work environment form of sexual harassment, and noted that the California Supreme Court had held that such harass-ment was actionable only if the harassing behavior is *pervasive* or *severe.* *Id.* at 28. (emphasis in original). That language appears to be an acknowledgement of the need to distinguish between the degrees of behavior falling between assault, arguably sexual harassment per se, and trivial behavior indicating a moral lapse, potentially worthy of disciplinary warnings, or other penalties.

The *Haberman* court also relied on *Hughes v. Pair,* 46 Cal.4th 1035, 95 Cal. Rptr.3d 636, 209 P.3d 963 (2009), a case worth discussing here. In *Hughes,* the defendant was a trustee of a $350 million trust provided by the plaintiff's late ex-husband for the benefit of their son. 95 Cal.Rptr.3d 636, 209 P.3d at 968. The plaintiff made a request of the trustees for $160,000 for a two-month rental of a beach house. *Id.* That request was unanimously rejected by the trustees, but a decision was made to authorize an $80,000, one-month rental. *Id.*

Approximately two weeks later, the defendant called the plaintiff to invite her son to accompany him and his son to a private showing at a museum. *Id.* During the course of the conversation, the defendant referred to the plaintiff as "sweetie" and "honey" and told her that he thought of her "in a special way, if you know what I mean." *Id.,* 95 Cal.Rptr.3d 636, 209 P.3d at 969. The plaintiff inquired as to why her two-month rental request had been denied. *Id.* The defendant told the plaintiff that he could be persuaded to change his vote if she were "nice" to him, and also said, "You know everyone always had a thing for you. You are one of the most beautiful, unattainable women in the world. Here's my home telephone number and call me when you're ready to give me what I want." *Id.*

The plaintiff took her son to the private showing at the museum where she encoun-

tered the defendant who was there with his son. *Id.* The defendant greeted the plaintiff's son and then told the plaintiff, "I'll get you on your knees eventually. I'm going to fuck you one way or another." *Id.* The plaintiff sued the defendant for sexual harassment in the context of relationships between providers of professional services and their clients. *Id.* The California Supreme Court applied the same legal principles of sexual harassment law in the workplace to that claim and held that although the remark at the museum was vulgar and highly offensive, it was not a threat to commit an assault on the plaintiff. *Id.*, 95 Cal.Rptr.3d 636, 209 P.3d at 975. To be pervasive, the sexually harassing conduct must consist of more than a few isolated incidents, and to be severe, an isolated incident may qualify if it consists of a physical assault or the threat thereof. *Id.*, 95 Cal.Rptr.3d 636, 209 P.3d at 974–75. The court used a reasonable person standard when assessing the severity of the conduct and concluded that the conduct was not actionable. *Id.*, 95 Cal.Rptr.3d 636, 209 P.3d at 975.

■ In the present case, while Haegert's comments and behavior might be characterized by some as inappropriate, vis-à-vis a co-worker, the complained of comments and behavior in this one incident do not constitute actionable sexual harassment in the form of hostile work environment. McMullan acknowledged that she did not tell Haegert that prior chin-chucking was unwelcome, and she never told him to stop engaging in that conduct with her. Instead, McMullan claimed that Haegert should have known that his conduct was unwelcome because of the look on her face, or her stony silence. Haegert had been put on notice by the University that he was not to use terms of endearment with his female students, and was not to hug or touch female students.

However, prior to the University's investigation of McMullan's formal complaint, Haegert had not been put on notice that McMullan found his conduct to be offensive and unwelcome. The University, therefore, did not establish by clear and convincing evidence that Haegert had committed sexual harassment in the form of hostile work environment.

Because the University did not meet its burden of proving that Haegert had committed sexual harassment in the form of hostile work environment, we find that the trial court erred by granting summary judgment in favor of the University and dismissing with prejudice Haegert's complaint against the University. We therefore reverse the trial court's entry of summary judgment in favor of the University, and remand this matter to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

MATHIAS, J., concurs.

VAIDIK, J., dissents with separate opinion.

VAIDIK, Judge, dissenting.

I respectfully dissent from the majority's decision to (1) reverse the trial court's entry of summary judgment in favor of the University of Evansville on grounds that it did not establish by clear and convincing evidence that John Haegert committed sexual harassment in the form of hostile work environment and (2) remand the matter to the trial court for further proceedings. Simply put, I believe that this case is governed by the terms and conditions of Haegert's employment contract with the University. That is, it is undisputed that Haegert's employment contract incorporated a zero-tolerance harassment and sexual harassment policy and that Haegert was aware that a violation of his

employment contract was cause for termination. According to Haegert's employment contract, the University bore the burden of proving a violation by clear and convincing evidence. Contrary to my colleagues, however, I believe that the University has proved by clear and convincing evidence that Haegert's August 25, 2004, incident with Margaret McMullan in the English Department lounge violated this policy. And because I believe that Haegert has received all the due process to which he was entitled, I would affirm the trial court's entry of summary judgment in favor of the University.

Haegert's employment contract with the University incorporated the Faculty and Administrator Manual, which provided that he could be terminated for violating the University's harassment and sexual harassment policies: "Harassment of any kind is unacceptable at the University of Evansville and is in conflict with the policies and interests of the institution." Appellee's App. p. 127; *see also id.* at 128 ("Sexual harassment is an especially sensitive and problematic form of harassment.... The University of Evansville specifically prohibits sexual harassment.... Sexual harassment violates the dignity of individuals and will not be tolerated.").

Harassment was defined in the Manual as "verbal or physical conduct which has the intent or effect of unreasonably interfering with the individual's or group's educational and/or work performance, or creating an intimidating, hostile, or offensive educational and work environment on or off campus." *Id.* at 127. Sexual harassment was further defined as:

[A]ny unwelcome sexual advance, request for sexual favors, reference to gender or sexual orientation, or other verbal or physical conduct of a sexual nature when:

  \*    \*    \*    \*    \*    \*

2. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or educational experience, creating an intimidating, hostile, or offensive working or academic environment and when this conduct has no germane or legitimate relationship to the subject matter of a course.

The courts recognize two types of sexual harassment, "quid pro quo" and "hostile environment." ... Hostile environment occurs when unwelcome sexual conduct from any employee, student, or faculty member interferes with job or academic performance or creates an intimidating, hostile or offensive work or learning environment.

Sexual harassment can occur between a student and a faculty member, employee or another student; between an employee and a supervisor; between co-workers or faculty colleagues; between faculty and staff or between any one of these individuals and a university customer, vendor, or contractor.

*Id.* at 129. The Manual provided the following examples of sexual harassment:

- Physical assault
- Unwelcome sexual advances, including unwanted touching, flirting, fondling, hugging, patting, pinching, or leering
- Verbal abuse or degrading propositions of a sexual nature, including sexually-oriented jokes, kidding, or teasing
- A sexually suggestive environment that interferes with the accomplishment of studies or work

*Id.* at 129–30.

Because the Manual governs both the substance and procedures for any sexual harassment claim occurring at the Univer-

sity, I believe that the majority's reliance on the California case of *Hughes v. Pair,* 46 Cal.4th 1035, 95 Cal.Rptr.3d 636, 209 P.3d 963 (2009), is neither instructive nor controlling. This is because in *Hughes,* the harassment laws at issue were Title VII of the Civil Rights Act of 1964 and the California Fair Employment and Housing Act—not an employment contract.

Here, the evidence shows that on August 25, 2004, English Department Chair and Haegert's supervisor, McMullan, was sitting in the English Department lounge interviewing a prospective student, Cassandra Stichter, and her family. After entering the lounge, Haegert approached McMullan, positioned his body next to her so that his belt was at eye level, said "Hi, Sweetie," stroked her neck and chin while she was addressing the prospective family, and left. The Stichters cut the interview short, and Cassandra did not enroll at the University. According to Cassandra's father, he was "shocked" when Haegert "fondled" and "tickled" McMullan's chin, which he found to be "inappropriate" and "unprofessional." *Id.* at 5, 13. Cassandra's father thought Haegert was "a lousy guy" and "a pig." *Id.* at 5, 13.

I believe that the University has proved by clear and convincing evidence that this incident violates the University's zero-tolerance sexual harassment policy. Haegert's actions of putting his pelvis in McMullan's face coupled with stroking her neck and chin and calling her "Sweetie" *while* she was interviewing a prospective student and her family constitutes unwelcome verbal and physical conduct of a sexual nature which creates an intimidating, hostile, or offensive working environment. Notably, the Manual gave examples of sexual harassment which include this very situation. And I am not alone in reaching the conclusion that Haegert violated the University's sexual harassment policy. As detailed below, several University committees, the University Board of Trustees, and the trial court unanimously reached the same conclusion.

After McMullan filed a formal sexual harassment complaint with Jennifer Graban, the University's Affirmative Action Officer, Graban convened a Review Committee, which was comprised of herself, the current ombudsperson, and a faculty member. The Review Committee interviewed Haegert and McMullan and unanimously concluded that Haegert's behavior violated the University's no-tolerance sexual harassment policy. The Review Committee then forwarded its report to University President Jennings. President Jennings brought the complaint before the University's Faculty Professional Affairs Committee ("FPAC"), which was comprised of approximately twelve elected faculty representatives. The FPAC unanimously concluded that the facts constituted adequate cause to terminate Haegert's employment with the University.

After receiving FPAC's findings, President Jennings decided to terminate Haegert's employment because of the August 25, 2004, incident involving McMullan. Haegert appealed the finding of sexual harassment and his termination with the Faculty Appeals Committee ("FAC"). The FAC held an evidentiary hearing at which both Haegert and the University were represented by counsel. Each party had the ability to call and examine witnesses and present evidence. At the conclusion of the hearing, the FAC unanimously concurred with the decision to terminate Haegert's employment with the University. President Jennings notified Haegert that his termination had been upheld, he was banned from the University campus and events, and his pay and benefits would terminate effective March 31, 2005. Haegert appealed the FAC's decision to the

University's Board of Trustees and submitted a brief on his behalf. The Board of Trustees unanimously concurred with the decision to terminate Haegert's employment for violating the University's sexual harassment policy.

Based on these facts, I believe that Haegert was afforded all the procedural review to which he was entitled and that he was terminated consistent with his employment contract. I would therefore defer to the considered judgment of the multiple layers of review that Haegert has already received and affirm the trial court's entry of summary judgment in favor of the University.