# FOR PUBLICATION

ATTORNEY FOR APPELLANTS:

**CHARLES E. DAVIS**
Davis Law, LLC
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES:

Oakmont Development Co., LLC
**ANDREW S. WILLIAMS**
Fort Wayne, Indiana

Mike Thomas Associates/F.C. Tucker, Inc.
**JONATHAN H. NUSBAUM, ESQ.**
Beers Mallers Backs & Salin, LLP
Fort Wayne, Indiana

FILED
Aug 07 2012, 8:55 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAMES E. CORRY and GAYLE CORRY, | ) | |
| | ) | |
| Appellants-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 02A03-1107-PL-323 |
| | ) | |
| STEVE JAHN, WOODLAND HOMES OF | ) | |
| FT. WAYNE, LLC, SCOTT R. MALCOLM, | ) | |
| OAKMONT DEVELOPMENT CO, LLC and | ) | |
| MIKE THOMAS ASSOCIATES/F.C. TUCKER, | ) | |
| INC., | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Stanley A. Levine, Judge
Cause No. 02D01-0710-PL-538

**August 7, 2012**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

James and Gayle Corry ("the Corrys"), whose residence was built by Woodland Homes of Ft. Wayne, LLC ("Woodland") brought suit for breach of contract, breach of fiduciary duty, breach of warranty, negligence, and fraud against Woodland, builder/realtor Steve Jahn ("Jahn"), realtor Scott Malcolm ("Malcolm"), Oakmont Development Co., LLC ("Oakmont") and Mike Thomas Associates/F.C. Tucker, Inc. ("MTA"). The trial court granted summary judgment to Oakmont and MTA, denied the Corrys' motion to correct error, and directed the entry of judgment upon the partial summary judgment order. The Corrys present a single, consolidated issue: whether partial summary judgment was erroneously granted.[1] We affirm.

**Facts and Procedural History**

The facts most favorable to the Corrys, the non-movants for summary judgment, are as follows. In 2001, Malcolm, an MTA realtor and a friend of James Corry, introduced the Corrys to his colleague, Jahn. In addition to being an MTA realtor, Jahn was the president of Woodland, a residential construction company. Jahn was an "approved builder"[2] on a list maintained by MTA and Jeff Thomas of MTA believed that Jahn may have built some model or "spec" homes for Oakmont. (Appellee's App. 355.)

---

[1] The Corrys also assert that they have not waived their right to a jury trial and, on remand, the matter should be scheduled for trial by a jury. On April 19, 2011, the trial court ordered that the case against the remaining defendants (Jahn, Malcolm, and Woodland) would be tried to the bench. This order is not referenced in the Corrys' Notice of Appeal and has not been certified for interlocutory appeal. Therefore, we do not address the propriety of that order.

[2] Jahn explained that he was one of a group of builders "allowed to build" when Mike Thomas "had a subdivision" and that there was a list of approved builders. (Appellee's App. 406.)

2

The Corrys agreed to purchase from Woodland a lot in Perry Lake Estates that Woodland had obtained from Oakmont, the developer of that subdivision.[3] On June 20, 2001, Michael Thomas, as General Partner of Oakmont issued a letter after reviewing a "progress drawing" or "completed drawing" of the proposed residence showing the proposed elevation. (Appellee's App. 408.) The letter was addressed To Whom It May Concern:

> This is to verify that the house being built at 1207 Dakota Drive (lot 117 Perry Lake Estates III) meets all architectural requirements set forth by the developer.

(Appellee's App. 452.)

On November 16, 2001, the Corrys entered into a contract with Woodland for the construction of a residence on Lot 117, next to Malcolm's lot. Oakmont had procured a joint soil test report regarding Lot 117 and Malcolm's lot and had been advised either that Lot 117 required pilings or pilings would be the most economical way to deal with unstable soil. In light of that information, Oakmont had agreed to sell the lot to Woodland at a reduced cost, to offset the cost of pilings. However, the construction contract between the Corrys and Woodland did not require pilings.

Jahn and the Corrys had several pre-construction meetings, often at MTA offices, with Malcolm present at some of the meetings. One or both of the Corrys repeatedly raised the issue of soil suitability. According to Jahn, the area was known to have "muck streams" and was considered "vulnerable." (Appellee App. 425.) Jahn first advised the Corrys "that [the]

---

[3] It appears from the record that the lot had not actually been deeded to Woodland from Oakmont when the Corrys agreed to buy the lot from Woodland. Jahn testified when deposed that it was a "common practice" to record deeds "at the same time" from the developer to the builder and from the builder to the homeowner.

house would require pilings"[4] because of soil conditions but later informed them that they "didn't need pilings." (Appellee App. 107-8.) Jahn's recommended alternative was to remove muck, compact dirt fill and "beef up" the concrete slab. (App. 408.) The concrete slab was poured one inch thicker than a typical slab, and steel rods were used instead of wire. The rods were in both the footers and the slab.

"Almost from the beginning" of moving into their new residence in 2002, the Corrys began to observe structural problems. (Appellee's App. 58.) Floor tiles cracked, there were cracks in the ceilings and walls, and a wall dropped away from the ceiling. The Corrys contacted Jahn, who advised them that cracks were routine and performed some cosmetic repairs.

The problems persisted and it eventually became apparent that the Corrys' house was sinking. In 2007, after learning that Woodland had gone bankrupt, the Corrys asked Malcolm to arrange a meeting with Mike Thomas of MTA. The meeting did not produce any solutions and the Corrys, at their own significant expense, had helical piers installed to stabilize the house.

On October 31, 2007, the Corrys filed a complaint for damages. As amended, the complaint asserted breach of contract, breach of fiduciary duty, breach of warranty, negligence, and fraud claims against Jahn, Woodland, Malcolm, Oakmont and MTA. Oakmont and MTA jointly moved for summary judgment on each of the claims. On March 23, 2011, the trial court (concluding "it is most obvious to this Court that the Plaintiffs are

---

[4] James Corry testified in his deposition that Jahn had said "your house will be on piers." (Appellee's App. 194.) According to James' testimony, he was aware that a house built on bad soil would sink.

4

suing Oakmont and MTA because Woodland Homes has gone out of business and filed bankruptcy") granted partial summary judgment. (App. A-198.) On February 14, 2012, the trial court directed the entry of judgment pursuant to Indiana Trial Rule 54(B). This appeal ensued.

**Discussion and Decision**

I.  Standard of Review

A party seeking summary judgment bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Smith v. City of Hammond, 848 N.E.2d 333, 337 (Ind. Ct. App. 2006), trans. denied. Once the movant satisfies this burden through evidence designated to the trial court pursuant to Indiana Trial Rule 56, the non-movant may not rest upon its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial. Id.

A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. Huntington v. Riggs, 862 N.E.2d 1263, 1266 (Ind. Ct. App. 2007), trans. denied.

On review, we apply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. Carie v. PSI Energy, Inc., 715 N.E.2d 853, 855 (Ind. 1999). In so doing, we consider only those portions of the pleadings, depositions, and other matters specifically designated to the trial court by the parties for

5

purposes of the motion. Ind. Trial Rule 56(C), (H). We accept as true those facts alleged by the non-moving party, which are supported by affidavit or other evidence. McDonald v. Lattire, 844 N.E.2d 206, 212 (Ind. Ct. App. 2006).

The trial court's order granting summary judgment is cloaked with a presumption of validity and the appellant bears the burden of demonstrating that the trial court erred. Heritage Dev. of Indiana, Inc. v. Opportunity Options, Inc., 773 N.E.2d 881, 888 (Ind. Ct. App. 2002). Where, as here, the trial court has entered specific findings, they may provide valuable insight into the trial court's rationale, but we are not limited to reviewing the trial court's reasons for granting or denying summary judgment. Meyer v. Marine Builders, Inc., 797 N.E.2d 760, 767 (Ind. Ct. App. 2003). Rather, a grant of summary judgment may be sustained on any theory or basis supported by the designated materials. Smith v. Yang, 829 N.E.2d 624, 625 (Ind. Ct. App. 2005).

## Breach of Contract

The Corrys alleged that each of the defendants breached the construction contract by allowing the house to be built without pilings and failing to disclose soil problems. They point to the apparent fact that each defendant profited in some way from the consummated real estate transaction. Oakmont and MTA denied the existence of a construction contract between the Corrys and Oakmont or MTA, much less a breach.

"The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." Haegert v. University of Evansville, 955 N.E.2d 753, 758 (Ind. Ct. App. 2011). Here, the designated materials disclose that the Corrys

entered into a written construction contract with Woodland Homes. Regardless of Oakmont's or MTA's receipt of lot proceeds or a sales commission, neither is a party to the construction contract, with attendant obligations. Their designated materials negated the elements of the Corry's breach of contract claim; thus, the trial court properly granted partial summary judgment on this claim.

Breach of Fiduciary Duty

The Corrys next alleged that the defendants had a fiduciary duty which they breached when they "failed to disclose their actual/potential conflict of interest with Plaintiffs, in that Jahn and Malcolm as licensed real estate agents were working for both the seller of the property and the Plaintiffs as the buyers." (App. A-34.) More specifically, the Corrys claim that Jahn and Malcolm acted as dual agents or limited agents and only belatedly obtained a written consent pursuant to Indiana Code Section 25-34.1-10-12.

Indiana Code Section 25-34.1-10-12 provides in relevant part: "A licensee may act as a limited agent only with the written consent of all parties to a real estate transaction." Nonetheless, the Corrys have not alleged that the untimely disclosure was a source of specific harm to them. Indeed, Indiana Code Section 25-34.1-10-12(c) additionally provides: "A cause of action does not arise against a licensee for disclosing or failing to disclose information in compliance with this section, and the limited agent does not terminate the limited agency relationship by making a required disclosure." Thus, even assuming there was a failure to timely obtain the written consent, this did not create a cause of action in favor of the Corrys and the trial court properly granted partial summary judgment on the purported

7

claim.

Breach of Warranty

The Corrys alleged that "[t]he work, materials and construction were not as warranted, but were defective." (App. A-35.) They identified the defect as the "sinking slab" and further alleged that Oakmont and MTA had knowledge of the defect and the subsequent failure to cure. (App. A-35.)

A warranty of habitability warrants that the house will be free from those defects which substantially impair its use and enjoyment. R.N. Thompson & Assoc., Inc. v. Wickes Lumber Co., 687 N.E.2d 617, 620 (Ind. Ct. App. 1997), trans. denied. In Barnes v. Mac Brown & Co., Inc., 264 Ind. 227, 229, 342 N.E.2d 619, 621 (1976), our supreme court extended the implied warranty of habitability to second or subsequent purchasers in the case of latent defects that are not discoverable upon the purchaser's reasonable inspection and which manifest themselves after the purchase.

Oakmont and MTA denied having made any warranty of habitability to the Corrys. In an attempt to withstand the grant of partial summary judgment, the Corrys claimed that Oakmont, as developer of the subdivision, had impliedly warranted that the soil of Lot 117 was suitable for building when the land was transferred to Woodland and this warranty extends to the Corrys.

The Corrys rely upon Jordan v. Talaga, 532 N.E.2d 1174 (Ind. Ct. App. 1989), trans. denied, for the proposition that a developer "is liable to the ultimate homeowner for a house that was built on bad soil under implied warranty." Appellant's Brief at 18. In that case,

8

developers had subdivided land such that a known channel of water ran along the border of the lot eventually purchased by the Talagas. Id. at 1178. The developers determined that an existing swale on the edge of the Talagas' lot would adequately handle the water drainage and direct it into the storm sewers. Id. A builder purchased the lot, sold it to the Talagas, and built a residence thereon, without being informed of any water problem. Id.

Although no water problem arose during construction, soon after occupancy the homeowners experienced backyard flooding and contacted both the builder and developers. Id. Additional measures did not alleviate the situation and eventually the Talagas had sustained significant damage to real and personal property, and they deemed their house, with the existing water course, to be "worthless." Id. at 1180. The Talagas sued the developers under alternative theories of negligence and breach of an implied warranty of habitability (claiming that the developers "knowingly sold property improved for the purpose of home building located in a substantial natural water course"). Id. at 1177. A jury awarded the Talagas damages; on appeal, a panel of this Court affirmed the verdict under the theory of an implied warranty of habitability. Id.

The Jordan Court stated the issue before it as: "whether a professional developer who improves land for the express purpose of residential homebuilding with knowledge but without disclosure of a latent defect in the real estate that renders the land unsuitable for the purpose of residential homebuilding breaches an implied warranty of habitability?" Id. at 1182. Finding very little authority in our state to provide direction, the Court took note of decisions in other states, and quoted the holding of a Colorado case, Rusch v. Lincoln-

DeVore Testing Laboratory, Inc., 698 P.2d 832, 835 (1984):

> Accordingly, we hold that if land is improved and sold for a particular purpose, if [the] vendor has reason to know that the purchaser is relying upon the skill or expertise of the vendor in improving the parcel for that particular purpose, and the purchaser does in fact so rely, there is an implied warranty that the parcel is suitable for the intended purpose.

Jordan, 532 N.E.2d at 1185 (quoting Rusch).

The Jordan Court went on to observe that "the facts and circumstances of the present case are particularly appropriate for the imposition of an implied warranty of habitability," in that the developers had done "more than sell raw land" and had platted, subdivided, and engineered considerable improvements. Id. The developers were professionals in real estate and one developer's real estate company had handled the sale of the home to the Talagas. Id. They knew about the water channel and were in the best position to choose to leave the lot in question undeveloped. Id. As such, they were in the best position to "absorb the loss attributable to the latent, undisclosed defect in the real estate they sold." Id. at 1185-86.[5]

Jordan is inapposite here. The defect identified by the Corrys in their amended complaint is the "sinking slab." (App. A-35.) This defect (which we assume, for summary

---

[5] In Smith v. Miller Builders, Inc., 741 N.E.2d 731 (Ind. Ct. App. 2000), Miller Builders improved real estate and sold it to the wife of an experienced homebuilder, Crachy. Crachy constructed a house, the basement of which flooded on one occasion. The Smiths purchased the residence and were informed by the Crachys of the prior flooding. Id. at 734. Mr. Smith observed some standing water in a drainage basin and asked Crachy whether the elevation of the water would be a problem. Id. at 741. It was ultimately discovered that Miller, the developer, had constructed drainage basins with less capacity than the plans called for. The trial court concluded that the Smiths had not relied upon Miller's skills or expertise and could not recover under an implied warranty of habitability. Id. On appeal, the developer claimed that reliance is an essential element of the implied warranty of habitability. However, this Court concluded that the Jordan Court had not adopted the holding of Rusch, and "proof of reliance on the subdivision developer is not mandated by our holding in Jordan." Id. We remanded the case for a determination of whether there had been a breach of an implied warranty of habitability.

judgment purposes, to exist) arose from failure to employ adequate construction techniques and not the subdividing or improvement of the land. Nor was there an undisclosed condition of the soil amounting to a latent defect. By all accounts, the developer, realtors, builder, and buyers all knew that Lot 117 required more than conventional building methodology to ensure house stability. Oakmont and MTA did not withhold information on the need for pilings and the land was apparently suitable for the purpose of residential homebuilding if pilings had been used.[6] Jahn determined and recommended that a "beefed up" slab should instead be constructed. (App. 408.) The Corrys acquiesced to this recommendation.[7] The source of the "defect" is the alternative methodology employed by the builder.

The trial court properly declined to impose an implied warranty of habitability upon the developer and real estate agency where the one positioned to prevent the harm – as discerned from undisputed facts – was the builder.

Negligence

The Corrys' negligence count alleged that Jahn's work was defective and negligently performed in an "unworkmanlike fashion" and that Oakmont and MTA "failed to insure that their agent, Jahn, complied with proper building practices on this home site that they sold and

---

[6] The Corrys have alleged that pilings should have been used on their lot, like that of Malcolm's next door to the Corrys.

[7] Although the Corrys were aware that pilings had been recommended (and Jahn himself had first recommended pilings), their agreement to forego the pilings may have resulted from a misunderstanding of the affected area. Gayle Corry's affidavit includes the averment that "Jahn and Malcolm told us that the bad soil was located in a corner where we were not building." (App. A-178K.) In her deposition, she explained: "There was one point where they said – we asked something about the problem with the soil, and they said it's out on the corner, and I can remember pointing my finger and I said, 'Well, we're not building out on the corner, so it's not going to be a problem, right?' And nobody corrected me, and it ends up later that it's the corner of the house." (Appellee's App. 146.)

11

recommended for building by Jahn." (App. A-37.) More specifically, the Corrys averred that Michael Thomas of MTA approved building plans (by issuance of the June 2001 letter approving architectural design) without following up and confirming that Jahn was using pilings.[8]

Oakmont and MTA respond that they had no duty to supervise Jahn or Woodland in the performance of the contract and that the Corrys did not bring a negligence claim within the two-year statute of limitations applicable to claims of professional negligence. The Corrys maintain that they have sustained damage to their real property and thus a six-year statute of limitations for injury to real property is applicable. However, we observe that the actual loss claimed is that of economic loss, and so the Corrys are relegated to contractual as opposed to tort remedies for the defect.

A defendant is liable to a plaintiff for the tort of negligence if (1) the defendant has a duty to conform its conduct to a standard of care arising from its relationship with the plaintiff, (2) the defendant has failed to conform its conduct to that standard of care, and (3) an injury to the plaintiff was proximately caused by the breach. Indianapolis-Marion Co. Public Library v. Charlier Clark & Linard, P.C., 929 N.E.2d 722, 726 (Ind. 2010). Where the injury to the plaintiff is from a defective product or service, the defendant is liable under a tort theory if the defect causes personal injury or damage to property other than the product or service itself. Id. Indiana cases have followed a rule precluding tort liability for purely economic loss – that is, pecuniary loss unaccompanied by any property damage or personal

---

[8] Although not an averment in the complaint, the Corrys later argued that Oakmont was negligent for not ensuing that additional engineering analysis was conducted.

injury (other than damage to the product or service itself) and this has become known as the "economic loss rule." Id. at 727. "[T]hese losses are viewed as disappointed contractual or commercial expectations." Gunkel v. Renovations, Inc., 822 N.E.2d 150, 154 (Ind. 2005).

In Indianapolis-Marion Co. Public Library, the Library had become concerned about the structural integrity of a parking garage, which was to serve as the foundation for the remainder of the library structure. Id. at 725. The Library hired an expert who confirmed that there were construction and design defects; based upon that report, the Library suspended construction and undertook repair work. Id. The Library brought suit against multiple defendants including sub-contractors and an engineer alleging negligent failure to perform engineering, administrative, and design work in a skillful, careful, workmanlike manner along with breach of contract claims with the parties with whom the Library had a contractual relationship. Id. The parties with whom the Library had a contract settled and the trial court granted the subcontractors and engineer partial summary judgment under the "economic loss rule." Id.

Our supreme court affirmed the grant of partial summary judgment. In so doing, the Court recognized that there are "several principal justifications" for the economic loss rule, including the inaptitude of tort law to resolve purely commercial disputes. Id. at 728-29. The Court found this justification "clearly implicated," explaining:

> From the outset of the project, the Library looked to a series of contracts to establish the relative expectations of the parties. And reliance on contract law in this regard is perhaps greater in construction projects than any other industry[.]

13

Id. at 730. A second justification – liability should not be imposed when it creates potential for liability so uncertain in time, class, or amount that the defendant should not fairly be expected to account for the potential liability when undertaking the conduct – was not directly implicated, because the damages were "by no means indeterminate," nor was there exposure for an indeterminate time or to an indeterminate number of plaintiffs. Id. The Court explained that the economic loss rule operates as a general rule to preclude recovery in tort for economic loss, but does so only for purely economic loss and even when there is a purely economic loss, exceptions to the general rule exist. Id.

After considering the Library's claim that there was an imminent risk of physical injury, the Court concluded that the Library had purchased a "product or service" that was an integral part of a construction project and "the economic loss rule applie[d]." Id. at 732. Although the Library argued that "the economic loss rule should not be applied to engineers and design professionals, whether or not in privity of contract with a plaintiff," the Court reiterated: "our default position in Indiana is that in general, there is no liability in tort for pure economic loss caused unintentionally." Id. at 736 (emphasis in original.)

The Court went on to conclude: "[w]e believe that the reasons for applying the economic loss rule to all participants in such a network or chain of contracts in a major construction project are compelling, whatever that rationale might be for not applying the economic loss rule to design professionals in other settings or contexts." Id. In essence, "'the law should permit the parties to a transaction to allocate the risk that an item sold or a

14

service performed does not live up to expectations.'" Id. at 737 (quoting Gunkel, 822 N.E.2d at 155).

Here, although the Corrys' construction contract was with Woodland, there were a "series of contracts to establish the relative expectations of the parties." Indianapolis-Marion Co. Library, 929 N.E.2d at 730. The damages claimed are for economic loss, that is, costs of repair and replacement of the defective product and diminution in the value of the product because it is inferior in quality. The Corrys may not recover under a negligence theory for purely economic loss.[9] The trial court properly granted summary judgment to Oakmont and MTA upon the negligence claim.

Fraud

Finally, in their claim for fraud or constructive fraud, the Corrys have alleged that Jahn, acting as an agent of Oakmont and MTA, advised that his "special slab" construction would alleviate any soil conditions. (App. A-39.) According to the complaint, Oakmont and MTA knew Lot 117 was not suitable for building a residence without pilings or piers[10] "but failed to disclose such facts," they failed to disclose "that Jahn or Woodland alone was the builder" or that "Jahn was not an agent of Oakmont or [MTA]," and they failed to "report a latent and detrimental soil condition to Plaintiffs." (App. A-38–A-39.) In sum, the Corrys

---

[9] Our supreme court, in Indianapolis-Marion Co. Public Library, acknowledged that there can be exceptions to the economic loss rule for services in appropriate circumstances: "we have mentioned possible exceptions (for purposes of illustration only) – lawyer malpractice, breach of a duty of care owed to a plaintiff by a fiduciary, breach of a duty to settle owed by a liability insurer to the insured, and negligent misstatement – that suggest situations in which the economic loss rule would not apply in the services context." 929 N.E.2d at 742. Here, the essence of the negligence claim against Oakmont and MTA is that they failed to supervise the building process and monitor compliance with the need for pilings.

[10] This may be a reference to helical piers, which the Corrys ultimately had installed.

have claimed that Jahn made a false recommendation for which Oakmont and MTA are responsible because they had pre-existing knowledge of unstable soil.

To prevail against Oakmont or MTA in a cause of action for fraudulent misrepresentation, the Corrys must demonstrate that: (1) Oakmont or MTA made false statements of past or existing material facts; (2) Oakmont or MTA made such statements knowing them to be false or recklessly without knowledge as to their truth or falsity; (3) the statements were made to induce the Corrys to act upon them; (4) the Corrys justifiably relied and acted upon the statements; and the Corrys suffered injury. Wise v. Hays, 943 N.E.2d 835, 840 (Ind. Ct. App. 2011).

The Corrys concede that they were initially informed, at least by Jahn,[11] of the need for pilings, (a recommendation that has apparently proven sound); thus, there was no "latent" defect. Oakmont and MTA do not claim that they, in addition to Jahn, specifically informed the Corrys of the need for pilings. However, they denied that they have made any false statement of past or existing material fact. In response, the Corrys have identified no such statement by Oakmont or MTA.

Instead, the Corrys assert that Jahn made an untenable claim and that both Malcolm and Jahn (who remain as defendants in this litigation) made statements that bad soil was in a corner of the lot. This arguably allowed the impression (to which Gayle Corry testified) that the bad soil was confined to that area and the house would not be directly affected.

---

[11] In her deposition, Gayle Corry was asked "Were you aware of soil problems at the time you built the home?" and she responded, "We were told that it would be a piling lot." (Appellee's App. 149.)

16

However, it does not amount to an affirmative misrepresentation regarding the character of the soil on which the house was constructed.

The Corrys seek to hold Oakmont and MTA responsible for Jahn's representations under a theory of derivative liability. Oakmont and MTA have denied that Jahn was authorized to act as an agent for either during the construction of the Corrys' residence.[12] Jahn also denied that he acted in an agency capacity vis-à-vis Oakmont or MTA. The question of whether an agency relationship exists and of the agent's authority is generally a question of fact. Johnson v. Blankenship, 679 N.E.2d 505, 507 (Ind. Ct. App. 1997), trans. granted and summarily aff'd, 688 N.E.2d 1250 (Ind. 1997).

In Indiana, "actual agency" is a relationship that results from the manifestation of consent by one party to another that the latter will act as an agent for the former. Hope Lutheran Church v. Chellew, 460 N.E.2d 1244, 1247 (Ind. Ct. App. 1984). Actual authority is created by written or spoken words or other conduct of the principal which, when reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account. Scott v. Randle, 697 N.E.2d 60, 66 (Ind. Ct. App. 1998), trans. denied. The agent must acquiesce to the arrangement and be subject to the principal's control. Hope Lutheran Church, 460 N.E.2d at 1247.

In contrast, apparent authority "exists where the actions of the principal give the contracting party the reasonable impression that the agent is authorized to enter into an agreement on behalf of the principal." Heritage Dev. of Indiana, Inc., 773 N.E.2d at 889.

---

[12] The designated materials indicate that Jahn was employed as a real estate agent for MTA. Accordingly, during the sale – as opposed to the construction – he acted as a representative of MTA.

The principal must make some communication that instills a reasonable belief as to the agent's authority in the mind of the third party and, as such, the alleged agent's statements alone are not sufficient to create apparent authority. Id.

Here, the designated factual material most favorable to the Corrys reveals that Jahn once signed – without authorization from Oakmont – a sales disclosure form indicating that he was doing so as a representative of Oakmont. Although he maintained an additional business address and a personal cell phone, Jahn frequently used office space at MTA for meetings and had access to MTA support staff and telephones. Gayle Corry "assumed" that Mike Thomas, Jahn, Malcolm, and Oakmont were all "one entity" because of "dealings" held with the same people at the same place. (Appellee's App. 50.) Likewise, James Corry felt that there was "one company" in that "all the people" seemed to be "in cahoots." (Appellee's App. 208.)

There is, however, no designated evidence that Oakmont or MTA directly or indirectly communicated to the Corrys that Jahn, when performing his duties as the principal of his construction company, also acted as an agent for Oakmont or MTA. The Corrys' assumptions and the limited sharing of office resources would not permit a reasonable finder of fact to conclude that Jahn was an agent of Oakmont or MTA for purposes of constructing the Corrys' residence. Neither could a reasonable factfinder conclude that Malcolm was acting as an agent of Oakmont or MTA when – during the construction process – he spoke of the location of the bad soil or acquiesced in Gayle's conclusion that it was in a corner beyond the proposed house site.

18

For summary judgment purposes, we take as true the allegation that Jahn advised his "special slab" construction would alleviate soil conditions. According to Jahn's deposition, he told the Corrys his method was the "best way to construct the home." (Appellee's App. 428.) Gayle Corry testified in her deposition that Jahn had claimed, "your house will be standing long after your children and grandchildren are gone. You know, this [method] actually makes a house more sound than lots that don't require pilings and don't have them." (Appellee's App. 146.) This is not, however, a representation of existing fact. Fraud may not be based upon representations regarding future conduct, or upon broken promises, unfulfilled predictions or statements of existing intent which are not executed. Biberstine v. New York Blower Co., 625 N.E.2d 1308, 1315 (Ind. Ct. App. 1993), trans. dismissed. Here, Jahn's representation of the adequacy of his building method amounts to a future prediction or puffery, for which Oakmont and MTA cannot be held liable under a fraud theory. The trial court properly granted Oakmont and MTA partial summary judgment on the fraud claim against them.

**Conclusion**

Oakmont and MTA were not parties to the construction contract at issue in this litigation. Thus, the trial court properly granted them summary judgment on the breach of contract claim. No cause of action arises from belated provision of a limited agency disclosure form, and thus the trial court properly granted Oakmont and MTA summary judgment on this claim. The trial court properly declined to impose an implied warranty of habitability on Oakmont and MTA where the builder was the entity best positioned to prevent

19

the harm.  Oakmont and MTA are entitled to summary judgment upon the breach of warranty of habitability claim.  The Corrys' claim is for economic loss and they are relegated to recovery in contract as opposed to negligence law.  The trial court properly granted Oakmont and MTA summary judgment upon the negligence claim.  Finally, the designated materials reveal that Oakmont and MTA made no fraudulent misrepresentation to the Corrys.  Jahn did not act as an agent of either entity when representing that his building methodology was superior and would produce a long-standing product.  Accordingly, the trial court properly granted summary judgment to Oakmont and MTA on the fraud claim.

Affirmed.

ROBB, C.J., and MATHIAS, J., concur.